JAMES F. McKAY III, Chief Judge.
11 Jimmy Hatfield (“defendant”) was con-' victed of second degree murder and sentenced to life imprisonment at hard labor, without benefit of parole, probation, or suspension of sentence. Finding no reversible error, we affirm the conviction and sentence.

STATEMENT OF THE CASE

Defendant was charged by grand jury indictment on July 23, 2010, with the second degree murder of Herbert Joseph Shiloh (“victim”), a violation of La. R.S. 14:30.1. Defendant pleaded not guilty át his July 27, 2010 arraignment. The trial court denied defendant’s motion to suppress the statement on July 14, 2011. On December 20, 2011, the trial court granted the State’s Prieur[1] motion to introduce evidence of other crimes, wrongs, or acts. Defendant sought supervisory review in this court and, on February 22, 2014, this court denied relief.[2] Trial by a twelve-person jury was held on October 22-25, 2012, on the last day of which, defendant was found guilty as charged. On December 18, 2012, the trial court denied |gdefendant’s motion for a new trial; defen-, dant expressly waived sentencing delays and was sentenced to life imprisonment at hard labor, without benefit of parole, probation, or suspension of sentence. On that same date, the trial court denied defendant’s motion for reconsideration of sentence and granted his motion for appeal. Defendant’s timely appeal followed.

STATEMENT OF THE FACTS

The victim was found dead inside the apartment of his girlfriend, Chiquita Spikes (“Ms. Spikes”), on April 10, 2010, from an apparent gunshot wound. Ms. Spikes testified at trial that she last saw *578 the victim on the night of April 9, 2010, when she left the apartment to go out with her girlfriend. After homicide detectives interviewed Ms. Spikes, defendant (Ms. Spikes’ former boyfriend) was identified as a suspect in the murder.
Ms. Spikes testified that she had known defendant for seventeen or eighteen years; that they had been in a relationship; and that she had children with him. She said they broke up after Hurricane Katrina, but that defendant did not want to end the relationship. In May 2009, Ms. Spikes obtained a domestic restraining order against defendant based on allegations of battery.
Ms. Spikes later began a relationship with the victim. At the time of his death, the victim was living with Spikes at her 14756 Chef Menteur Highway apartment in eastern New Orleans.
Defendant was not allowed to see the couple’s children at Ms. Spikes’ apartment, and he did not have a key to the apartment. On April 9, 2010, Ms. Spikes took defendant to see their children at her mother’s residence. Ms. Spikes testified that while they were at her mother’s house, defendant asked her to give |3him a kiss and a hug. When she told him no, defendant complained that if he had been “that ni — ” she would have given him a kiss and a hug. Ms. Spikes said defendant was referring to the victim. Ms. Spikes left her mother’s to give defendant a ride home and to go out with a friend. Ms. Spikes agreed to allow defendant to use her car. She removed her house keys and the key to her mother’s home from her key ring and gave defendant the key to her car.
Ms. Spikes got out of her car at her friend’s Ms. Whitley’s, residence. Defendant drove off, and she and Ms. Whitley went out in Ms. Whitley’s car to the Autocrat Social and Pleasure Club, where she encountered defendant. She and Ms. Whitley next went to the Carnival Club. She did not see defendant there. During this period of time, defendant called Ms. Spikes’ cell phone numerous times. She and Ms. Whitley went on to the New Edition Club, where they again encountered defendant. Inside the club, defendant asked Ms. Spikes to dance and to give him a kiss, both of which requests she declined. He told her that if he had been “that ni— in the club” she would have given him a kiss and a dance. Ms. Spikes told him to get away from her, and he pushed her face with his hand such that her head hit the wall, and she was left with scratches on her face. Defendant then ran out of the club, and she ran after him. Ms. Spikes told a bouncer outside that defendant hit her and that she wanted her car keys back from him. The bouncer told her to stay in the club and that he would try to get her keys back, but he was unsuccessful.
Defendant subsequently came back inside the club with the car key in his hand, which he pushed against Ms. Spikes’ neck. Defendant then ran out the back door. When Ms. Spikes left the club, defendant was standing across the street by her car staring at her. Ms. Spikes and Ms. Whitley left. Defendant continued to call Ms. Spikes repeatedly. Between 4:00 and 5:00 a.m. Ms. Spikes and Ms. |4Whitley arrived at the Waffle House on Read Boulevard in eastern New Orleans. While at the Waffle House, defendant left a message on Ms. Whitley’s cell phone. Ms. Spikes said she did not return to her apartment that night, but stayed at 7856 Venice Boulevard.
Ms. Spikes called defendant in the early morning hours of April 10, 2010, because she wanted her car back. She reached him shortly after 7:00 a.m. At that time, defendant told her he could not talk to her because he had been shot, and he was talking to the police.
*579 Ms. Spikes saw defendant later that day at her mother’s residence, when he returned her car. Defendant told her that after he parked her car earlier that morning at his apartment complex in Metairie, he went back outside to check whether he had locked the doors. He said that he saw Hispanic males around her car, and that when he told them to get away, they shot him.
After getting her car back from defendant, Ms. Spikes returned to her apartment, wherein she noticed that the lock on the door was broken. Upon entering, she discovered the victim lying on the floor of the upstairs bedroom in a pool of blood. Ms. Spikes ran out the front door. Her cousin telephoned her as she ran out, and that cousin called the police. Ms. Spikes denied killing the victim. She stated that she did not notice anything missing from her apartment, and nothing was disheveled.
Ms. Spikes explained on cross examination that she and defendant had broken up and gotten back together, on and off again, multiple times. She confirmed that defendant was violent towards her. She stated that she and the victim had only been together a couple of months.
|sOn redirect examination it was established from defendant’s cell phone records that on April 10, 2010, Ms. Spikes called defendant prior to 2:11 a.m. and at 7:25 a.m. The records also reflect that defendant called Ms. Spikes a total of forty-five times, with twenty-three of them being made between 2:11 a.m. and 4:17 a.m.
Ms. Whitley testified that she was a friend of Ms. Spikes for over sixteen years. She described a tumultuous relationship between Ms. Spikes and defendant, including the May 2009 domestic incident, which Ms. Spikes described in her testimony. Ms. Whitley also corroborated the events of April 10, 2010, as testified to by Ms. Spikes. Specifically, she confirmed that defendant: 1) followed her and Ms. Spikes to various clubs that night; 2) had a physical altercation with Ms. Spikes at the New Edition Club; 3) repeatedly called Ms. Spikes during the night; and 4) called Ms. Whitley’s cell phone, leaving a voicemail message, while she and Ms. Spikes were at the Waffle House between 4:00 a.m. and 5:00 a.m. Cell phone records produced at trial demonstrated that defendant called Ms. Whitley at 4:49 a.m.
The voice mail message left on Ms. Whitley’s cell phone was played for the jury. Over the objection of defense counsel, Ms. Whitley answered the State’s question as to what she understood defendant to say in the message. Ms. Whitley testified that defendant stated: “He’s a real nasty ni — . He’s not playing games and it’s over with.” After defendant left that message, Ms. Whitley called him back and, when defendant inquired about Ms. Spikes, she lied and told him Ms. Spikes was not with her anymore. Ms. Whitley eventually dropped Ms. Spikes off at Ms. Spikes’ mother’s home that morning.
| fiMaryann Shiloh (“Ms. Shiloh”), the victim’s mother, testified that she last spoke to the victim when he telephoned her at 2:30 a.m. on April 10, 2010, and he was in good spirits at that time. She telephoned him at approximately 6:15 a.m. later that morning after she had gotten to work. He did not answer. She tried calling him again later that evening when she got off from work. Someone answered the phone and hung up. She called right back, and a detective answered. He told her to go to Tulane Avenue and Broad Street, where she discovered that her son had been killed. Ms. Shiloh said the victim did not have a wallet, but he kept his personal belongings in a “little plastic thing” in which one would keep a social security card. After her son’s funeral, Ms. Shiloh *580 collected from Ms. Spikes a “plastic thing” in which the victim kept his belongings, which she' identified at trial.
Jefferson Parish Sheriffs Office (“JPSO”) Deputy Scott Hillburn (“Dep. Hillburn”) testified that on April 10, 2010, he responded to a call from East Jefferson Hospital, where defendant was being treated for a gunshot wound to his leg. Dep. Hillburn testified on direct examination that he arrived at the hospital at approximately 7:45 a.m. However, on cross examination, he confirmed that he arrived at 6:45 a.m. Dep. Hillburn interviewed defendant in a trauma room, where he related the circumstances of a shooting in the parking lot of his apartment complex in Metairie. Defendant told Dep. Hillburn that after he parked his car (Ms. Spikes’ car) and went inside his apartment then he remembered that he forgot his iPod in the car. He went outside and saw three or four Hispanic males trying to break into the car. He shouted at them, and one of the men directed a slur at him. Defendant said he then heard two shots and ran. He said he hid behind a vehicle for fifteen minutes before going back to his vehicle to retrieve his iPod. It was at |7this time defendant said he noticed that he was shot, and he drove himself to East Jefferson Hospital. Defendant did not know exactly when he was shot, but he mentioned 2:00 a.m. and 3:00 a.m., and he also put the time as an hour before he got to the hospital.
Dep. Hillburn described the wound as what appeared to be a gunshot hole in the back of defendant’s thigh. Dep. Hillburn said he checked to see if there had been any reports of gunshots in the time period when defendant had been shot, and there had been none. He instructed two JPSO deputies to go to defendant’s parking lot; they found no spent cartridge casings, no gun, and no blood. The crime lab took photographs of defendant’s wounds and processed his vehicle. Dep. Hillburn turned over the investigation to JPSO Detective Cedrick Gray (“Det. Gray”), who arrived at the hospital at approximately 8:30 a.m. After refreshing his recollection with his report, the deputy admitted that that there was nothing in it about defendant reporting that the shooting occurred at 2:00 a.m. or 3:00 a.m. Dep. Hillburn replied in the negative when asked on redirect examination whether defendant ever told him that he was shot while trying to buy drugs.
Det. Gray testified that he responded to the call from East Jefferson Hospital. Det. Gray said he ascertained that defendant was coherent by asking him for his name, address, and social security number, which were the same ones defendant had given to Dep. Hillburn. Defendant related that the previous evening he had gone to visit his girlfriend and their children and that at approximately 11:00 p.m. he left in his girlfriend’s car. Defendant said he visited several clubs, one being the Autocrat Club; drove around a while; and went to a sandwich shop. Defendant said he then went home which, Det. Gray said, would have been 2:00 or 3:00 a.m., according to defendant’s estimation. Det. Gray said he believed | ^someone from the hospital contacted JPSO at approximately 6:30 a.m. about a patient with a gunshot wound.
Det. Gray testified that defendant related the same circumstances of the shooting as he described to Dep. Hillburn, regarding the Hispanic males in the parking lot of his apartment complex. Det. Gray said that the only report of gunfire that night had been one at approximately 3:00 a.m., four miles away — presumably meaning four miles away from where defendant said he had been shot. Det. Gray testified that defendant told him that when he got to the apartment that morning, he knocked *581 on the door and his sister, Mona Hatfield (“Ms. Hatfield”), let him in. Defendant claimed he lived with his sister in her apartment, but knocked on the door because he did not have a key.
Ms. Hatfield came to the hospital and spoke with Det. Gray before she spoke with defendant. Det. Gray testified that Ms. Hatfield told him that she had no contact with defendant since she left her apartment at around 4:00 p.m. the previous afternoon. She further said she had not spoken to him by phone, and she arrived home about 3:00 a.m. that same April 10, 2010 morning. Ms. Hatfield confirmed that defendant did not have a key to her apartment. She explained that she did not hear a knock on her door after she arrived home and did not let defendant inside.
Det. Gray testified that defendant never actually answered his question as to the inconsistency between his and his sister’s stories. He said that when he asked defendant about this inconsistency, defendant became irate and was reluctant to give him information.
After defendant was released from the hospital, Det. Gray followed him back to the Metairie apartment complex and asked defendant to walk him through |flthe events of the shooting. Defendant took the detective on the path he had taken when he ran over to hide behind a van. The van was still parked there. Defendant told Det. Gray he was about ten to fifteen .yards away from his car when the shots were fired, but he was not sure where he was when he was shot. Det. Gray did not observe any blood around the van. Det. Gray said it was approximately fifty yards from the front of defendant’s car to the van. Det. Gray noted that at about half that distance defendant could have taken a left turn to go hide behind the apartment complex or tried to go back into his apartment. Det. Gray canvassed the area but found no blood evidence, no spent cartridge casings, and no evidence of any bullet strike marks on the building or fence near where defendant said he hid. Det. Gray said defendant was still angry and reluctant to talk to him and that defendant became the most irate while showing him the van. Det. Gray said he explained to defendant that in order to investigate the crime with the goal of identifying the people who shot him, it would require his cooperation. At that point defendant told the detective he was not answering any more questions.
Det. Gray spoke with two unidentified individuals present at the apartment complex who claimed they heard no gunshots or disturbances that night. There were no surveillance cameras in the area. Det. Gray was later contacted by the New Orleans Police Department (“NOPD”) with regard to a homicide investigation, and he provided them with the information gathered in his investigation of defendant’s gunshot wound.
NOPD Homicide Detective Barrett Morton (“Det. Morton”) was the lead investigator on the homicide case. He testified that the door to Ms. Spikes’ apartment had been breached. The victim appeared to have sustained one gunshot wound to the top of his head and one to his left shoulder. The lower part of his | 10body was wrapped in bed linens like he had been in bed. Det. Morton testified that in a burglary there is usually some sort of breach, like a door being forced open. But he said that normally there are some signs of a search or ransacking, with drawers and cabinets opened and with objects of value missing. He said in the instant case there was absolutely no sign of a burglary, beyond the door having been forced open. Hé said one object that stuck out was a video game console that he believed would have been taken in a burglary. He said that *582 Ms. Spikes was never a suspect, although he interviewed her. She cooperated with the investigation. Defendant was developed as a suspect based on information given by Ms. Spikes.
Det. Morton obtained defendant’s cell phone number and a map of cell tower locations, which he identified at trial. He said he determined from these documents that calls defendant made after 4:00 a.m. bounced off “[t]he Michoud tower” in eastern New Orleans. Det. Morton recalled that defendant said he returned home to his Metairie apartment at 6:00 a.m. or so. Defendant told Det. Morton that he was confronted by two Hispanic males attempting to burglarize his car; one of the males shot him. He also told Det. Morton that he discarded the clothing he was wearing when shot in a dumpster at the apartment complex. Det. Morton explained that the articles of clothing were retrieved from the dumpster. The clothing was bloody, but there were no bullet holes consistent with a shooting.
Det. Morton testified that some information defendant gave to JPSO Det. Gray was inconsistent with what defendant told him, such as the location of the shooter; the description of the perpetrators; and that he told JPSO that he went to his car to retrieve his iPod, while telling Det. Gray that he went out to make sure the car was locked.
|nDet. Morton confirmed that Ms. Whitley, who was with Ms. Spikes on the evening in question, played for him a voice mail message defendant left on her phone around 4:50 a.m., which, according to the detective, “said basically, ‘I’m a real ni — . I handle mine,’, words to that effect, and ‘It’s over now. It’s over.’ ” Det. Morton said defendant’s cell phone location at 4:50 a.m. was around the intersection of Interstate 10 and Little Woods (in eastern New Orleans), heading, if the detective recalled correctly, toward the homicide location.
On cross examination, Det. Morton acknowledged that the time of the victim’s death was very important to his investigation. He admitted that he had not talked to the pathologist who performed the autopsy on the victim before he prepared his application for an arrest warrant for defendant. Det. Morton confirmed that a gunshot residue “test” was performed on defendant and on Ms. Spikes. He confirmed on redirect examination that because of the passage of some hours, after defendant had been first to the hospital, then home, and he was no longer wearing the clothes he had been wearing earlier, he did not submit the gunshot residue (“GSR”) (apparently meaning he did not submit the swab(s) taken of defendant’s hands for testing) because “it would have never have been accurate.” He also testified on redirect examination that he did not have the GSR test run on the swab(s) taken from Ms. Spikes because of the passage of time, basically for the same reason he did not complete the GSR testing process with defendant.
Det. Morton also confirmed on cross examination that defendant said nothing in his statement about being shot at 4:00 a.m., although Det. Morton admitted that in his report he stated that defendant made a comment about having been shot at 4:00 a.m. outside his apartment in Me-tairie.
11?Det. Morton confirmed that a check of Ms. Spikes’ cell phone records against the cell phone tower map confirmed that she was at the Waffle House when she said she was there and afterward was at her mother’s home when she said she was there. This verification was another reason he did not forward Ms. Spikes’ GSR swab(s) for analysis. Det. Morton confirmed that after interviewing Ms. Spikes, he had defen *583 dant arrested for domestic abuse battery based on Ms. Spikes’ allegations as to what had occurred in the New Edition club.
NOPD Sergeant Kevin Burns Jr. (“Sgt. Burns”) testified that he assisted Det. Morton in the homicide investigation. Sgt. Burns went to the scene on April 10, 2010. The dead bolt on the door was broken and on the ground. Ms. Spikes was sitting on some stairs across from the crime scene. She was calm, but appeared to be in shock. He spoke to her. She was never developed as a suspect in the killing. Det. Morton alerted Sgt. Burns that defendant was a possible suspect and his location. Sgt. Burns picked defendant up and transported him to the homicide office.
Sgt. Burns advised defendant of his Miranda [3] rights and took a verbal statement from him. Defendant admitted that he did have a verbal confrontation with Ms. Spikes at the New Edition Club. He denied following her home. He said he went to a sandwich shop, which the detective believed was at Elysian Fields and St. Claude Avenues. Defendant denied having relocated to eastern New Orleans. He said he went straight home to his Metairie apartment, arriving there at approximately 4:00 a.m. Defendant also related the episode with the Hispanic males.
| igSgt. Burns confirmed on cross examination that he did not write a report in the case. He stated that Ms. Spikes told him that the last time she spoke to the victim was on the phone, at approximately 5:00 p.m. on April 9, 2010; that it had been a short conversation; and the victim had been angry with her the last time they spoke. Ms. Spikes related that the last time she saw the victim was at her apartment at approximately 7:00 p.m., when she went home to retrieve some of her personal belongings in order to be able to get ready to go out for the night.
NOPD Homicide Detective Anthony Pardo (“Det. Pardo”) testified that he assisted Det. Morton in the instant case. He recovered some clothing contained in a Jefferson Parish hospital bag from a dumpster located at defendant’s apartment complex. Det. Pardo identified crime scene photographs of the apartment complex; the dumpster; and the bag of clothing, containing bloody jean shorts, plaid boxer shorts, and two socks. Upon examination of the boxer shorts and the jean shorts, Det. Pardo stated that he did not see any holes in the clothing that would correspond to bullet holes.
NOPD Technician Shaheed Muhammad (“Mr. Muhammad”) testified that he assisted in the investigation at the victim’s apartment on April 10, 2010. He noted that the door to the apartment had apparently been kicked in. Otherwise, the first floor was undisturbed. The victim was upstairs in the first of three bedrooms. The upstairs was relatively clean. Besides the bedroom where the body of the victim was found, there was no evidence of a disturbance or a struggle in any other room. Mr. Muhammad identified his report in the case, the photographs he took at the scene, two spent PMC brand .32 auto caliber casings that Mr. Muhammad collected at the scene, two pieces from the broken door lock, and the GSR swab that Mr. Muhammad took from Ms. Spikes’ hands.
114Marilyn Dilley (“Ms. Dilley”), the custodian of records for Sprint, identified State Exhibit 110 as a call detail record, including cell phone tower sites, for defendant’s cell phone number. Ms. Dilley further identified State Exhibit 111 as a list of all cell phone tower sites served by *584 Houston Switch, which were the cell tower sites cited on State Exhibit 110. Ms. Dil-ley reviewed a number of call entries, noting the times, numbers called, and cell towers off which the calls had pinged. Ms. Dilley next identified Ms. Spikes’ cell phone records, again reviewing a number of calls to that number from defendant’s number and the cell towers off which those calls pinged.
Searle Brown (“Mr. Brown”)[4] was called by the State. He testified that he was asleep in the early morning hours of April 2010, when defendant telephoned him and proceeded to tell him: “Man this bitch ass ni— got into it.” Mr. Brown said defendant never said the individual’s name, but when Mr. Brown was asked by the prosecutor whether defendant referred to the person he had got into it with in any other way, Mr. Brown replied: “Oh, ‘The bitch ass ni— that,’ you know, ‘my baby momma messing with.’ ” Mr. Brown said defendant told him he was “hit.” Mr. Brown asked defendant what he meant, whether the person had tried to. hit him in a car or something or with a stick or bat, etc. He said defendant replied: “No, I’m bleeding.” When Mr. Brown asked him what he meant, defendant said: “Man, I think I’m shot.” Defendant elaborated that a gun had discharged as he was trying to get it out of his pocket or waistband or something like that. Mr. Brown told defendant he did not want to get involved; that he needed to get off the phone; l^and he asked defendant why he was phoning him, telling him that he needed to go to the hospital. Mr. Brown said he recalled a question being asked as to where defendant’s “baby momma” was while this was going on, and defendant replied that she had not been there.
The prosecutor asked Mr. Brown to highlight his phone number on an exhibit — presumably State Exhibit 54, a blowup of defendant’s cell phone records — confirming that the call from defendant to Mr. Brown was at 6:10 a.m. Mr. Brown also highlighted his phone number on the exhibit a second time, for a call at 9:40 a.m. When asked by the prosecutor whether he remembered defendant calling him back, Mr. Brown said: “Kind of, yeah, I kind of remember.”
Mr. Brown denied on cross examination that defendant contacted him and actually came over to his residence again and again, asking him to sell defendant marijuana, but that he, Mr. Brown, was mad because defendant owed him money. Defense counsel asked Mr. Brown whether defendant had offered him an iPod as pay: ment for the money defendant owed him and whether he then shot defendant in the leg to teach him a lesson. Mr. Brown denied all these allegations.
Mr. Brown’s parole officer, Tonya Ramsey, confirmed Mr. Brown’s cell phone number. She had been supervising Mr. Brown since November 2010, and she said there was nothing in his record, even from 2009, to suggest that he had been selling drugs at any time since he had been on parole.
Richard Tracy, M.D. (“Dr. Tracy”) conducted the' autopsy on the victim. He identified his autopsy protocol/report in the case. There were two gunshot entry wounds in the victim’s body, one being fatal. There was no sign that either of the two bullets had been fired from within eighteen inches. Dr. Tracy said that, based on the body being discovered at 7 p.m., and the lividity (the gravitational set *585 tling|i6of the blood in the body), he opined that the body had been face down for at least four to six hours before it was found. He confirmed that it could be not excluded that death occurred as early as 4:00 a.m. on April 10, 2010, the day the body was discovered, to as late as four to six hours before it was found. Dr. Tracy also confirmed that he could not scientifically exclude the victim having been killed between the hours of 5:00 a.m. and 5:30 a.m.
On cross examination, Dr. Tracy stated that he could not exclude the possibility that the victim died sometime after 9:00 a.m. Dr. Tracy confirmed on cross examination that when he spoke to defense counsel in a meeting on July 11, 2012, he typed out his conclusions and signed them. He conceded that he may have said in that statement that the victim died sometime after 9:00 a.m., but he maintained at trial that he had been speaking out of turn and that it could not be determined from the physical findings. Defense counsel brought out that Dr. Tracy previously stated that “[i]t is outside of the range of possible at 4:00 am.” Dr. Tracy said the wording was crude and that he should have written “before 4:00 a.m.” instead of “at 4:00 am.” Dr. Tracy testified that he could not exclude the outside time of death as early as 4:00 a.m. But he also said that he could not exclude the possibility that the victim died sometime after 9:00 a.m. He also confirmed that he said it was most likely that the victim died somewhere in the middle of the range, but he said that was a crude judgment call.
Dr. Tracy ultimately confirmed on cross examination that his best guess was that the victim died somewhere in the middle of the range between 9:00 a.m. and 4:00 p.m., such as around 11:00 a.m. or 12:00 p.m., and that this conclusion was based entirely on lividity. However, Dr. Tracy again confirmed on redirect |17examination that he could not scientifically exclude the possibility that the victim was killed between 5:00 a.m. and 5:30 a.m.
New Orleans EMS Paramedic Jordan Ehrich (“Mr. Ehrich”), testifying for the defense, stated that he arrived on the scene of the homicide around 8:00 p.m. on April 10, 2010. He said the victim’s body had begun to stiffen and that it was in the beginning stages of rigor, a fact he noted in his report.
Mr. Ehrich admitted on cross examination that he had no training in the field of lividity and rigor, nor was he in any way an expert in such field. Mr. Ehrich explained that the purpose of putting in his report the notation of rigor mortis was to document that the individual had been down for an extended period of time and that resuscitation efforts would be futile; it had nothing to do with estimating the time of death. He said that he would defer to the coroner on time of death.
Collie Trant, M.D. (“Dr. Trant”), testifying for the defense, was qualified by stipulation as an expert in anatomic and forensic pathology. It was his opinion that the victim did not die before noon on April 10, 2010. He based his opinion on two facts: (1) the paramedic arriving at 8:02 p.m. and noting in his report that there was early rigor mortis, which is the hardening of the muscles; and (2) Dr. Tracy’s report noting that there was anterior and posterior livor mortis, which is the settling of the blood to give a red color to the surface to which the blood is settling. Dr. Trant believed that because rigor was not fixed, it was early, and thus the time of death had been “maybe” five to eight hours before the paramedic noted the early rigor.
As for the livor mortis, Dr. Trant said that Dr. Tracy’s autopsy report noted both anterior and posterior livor mortis. Thus, Dr. Trant stated lividity had not been fixed by the time the body — which was discover *586 ed face down and apparently |ishad not been moved after the time of death — was turned over by authorities and transported to the morgue, where it was left face up overnight, allowing for some settling of blood in the body to the posterior side. Dr. Trant said the medical literature established that it takes eight to twelve hours for lividity to become fixed. He said lividity had been partially fixed, and so the body had been lying face down for less than eight to twelve hours. He said it could have been seven to eleven hours “or something like that.” Dr. Trant did not believe that the victim lived very long after being shot in the head.
Dr. Trant conceded on cross examination that some studies showed that lividity can take up to eighteen to twenty-four hours to become fixed. However, he said that was not routine. He also conceded that some reports stated that it could take twenty-four hours for rigor mortis to fully develop. However, he confirmed that he had incorporated those reports in reaching his conclusions in the instant case. He admitted that he could not say with one hundred percent certainty that the victim was not killed between the hours of 5:00 a.m. and 5:30 a.m. Dr. Trant confirmed on cross examination that he did not actually inspect the body.
Dr. Trant stated on redirect examination that his estimate that in 95.5 percent of cases rigor mortis fully develops in six to ten hours was based on a bell curve of study figures. With regard to the cases in which full rigor mortis might develop earlier, Dr. Trant indicated that heat would be factor speeding up the development of rig- or. But, he confirmed that all of the time estimates he had been talking about assumed “room temperature,” although “room temperature” was never defined by him. Dr. Trant saw no indication that the police noted the temperature of the room, nor did the autopsy report reflect that the temperature of the body had been taken, 11flDr. Trant reiterated that, in his opinion, the time of the victim’s death was sometime after noon.
James Traylor, M.D. (“Dr. Traylor”), qualified by stipulation as an expert in the field of forensic pathology, testified on rebuttal for the State. Dr. Traylor confirmed that he reviewed the victim’s autopsy protocol/report. Dr. Traylor defined lividity, as the term was being discussed in the instant case, as gravity-dependent settling of blood after death. He defined rigor as the stiffening of muscles after death. He explained that one can usually detect rigor within an hour or two after death and that rigor becomes fully formed in the twelve hours following death, and in the next twelve hours it begins to lessen. He said that once rigor is “broken” with marked difficulty, it does not reform. He said both lividity and rigor were temperature dependent.
When Dr. Traylor was asked by the prosecutor whether there was anything in Dr. Tracy’s autopsy protocol/report or the paramedic’s report, from which he could say scientifically excluded that the victim was killed between 5:00 a.m. and 5:30 a.m. on April 10, 2010, Dr. Traylor answered that he could not “definitively exclude” that time frame, concluding his answer by saying: “It’s just too close.”
Dr. Traylor testified that he could not gauge rigor from a photograph shown him by the prosecutor, stating that would be something he would have to physically feel. However, he noted that when Dr. Tracy performed the autopsy some thirteen hours later, he described the rigor as broken with marked difficulty. As to lividity, Dr. Traylor noted that Dr. Tracy had noted anterior and posterior lividity. He further noted that one could see lividity in *587 one of the crime scene photographs of the victim lying face down.
1 i>f|Dr. Traylor referred to lividity being almost fixed, but said it could not have been totally fixed because there would not have been any posterior lividity. Dr. Traylor then stated:
So, in general you got eight to twelve hours. Now if you say, you know, they’re saying what, 5:00 or 5:30, if you go back a full twelve hours and you’re at 8:00 o’clock in the morning, this tells me that the individual was alive.
Dr. Traylor said he had no idea how long the victim may have lived after being shot, commenting that “it’s possible he could have lived fifteen minutes, half an hour or an hour. I don’t know.” He noted that the victim did breathe for a while after being shot, based on the bloody frothing at the victim’s nose, which, he said, “now narrows that time frame back behind 8:00 o’clock. So could it be 5:00 or 5:30? If that’s what you’re asking me to work with, I cannot exclude it.”
Dr. Traylor confirmed on cross examination that in an email to him, defense counsel had asked him about his statement, “that you think the decedent may have died five to six hours from the time the body was found, meaning around 2:00 or 3:00pm [sic] in the afternoon on 4/10.” Dr. Traylor read for the jury the response he had emailed to defense counsel: “Correct, based on shifting of lividity and onset of rigor.” Dr. Traylor explained that he now had more information. He confirmed that at the time he made that statement, he had Dr. Tracy’s autopsy protocol/report and the paramedic report, but had not seen any photographs except the gunshot photographs.
On redirect examination, the prosecutor asked Dr. Traylor if he could scientifically exclude the possibility that the victim was shot and killed at 5:00 a.m. to 5:30 a.m. on April 10, 2010, and Dr. Traylor replied: “I cannot.” Dr. Traylor 1^ further stated on cross examination that he could not exclude that the time of death could have been a little later, like 8:00 a.m.
Over the defense’s objection as to improper rebuttal testimony, the State questioned Dr. Traylor about the bullet wound in defendant’s thigh. Dr. Traylor testified that, based on photographs of defendant’s leg taken in the hospital, showing the entrance and exit wounds from the bullet, defendant could not have received the gunshot wound in his thigh from someone standing even a few feet away. He opined that the muzzle of the gun had been approximately one inch from' the skin when the gun was fired. Dr. Traylor described the general trajectory of the wound as top to bottom, right to left, and front to back, and he said it was not consistent with someone walking up to the victim and shooting him in the leg from even a couple of feet away. He stated it would be more possible that the wound could have been sustained if the victim had been carrying a gun in his waistband and running, and it discharged while he was running. That would explain why there was no hole in defendant’s pants/shorts or why there was no soot or anything else except around the wound. Dr. Traylor believed it could be a possibility that defendant was going for a gun or putting a gun back into his waistband and it discharged.

ERRORS PATENT

A review of the record reveals no patent errors.
We now turn to the merits of defendant’s ten assignments of error.
ASSIGNMENT OF ERROR NUMBER 10 — Sufficiency of Evidence
Defendant’s tenth and final assignment of error asserts that the evidence was insufficient to support his conviction. *588 When the issues on appeal relate to both the Insufficiency of the evidence and one or more trial errors, the reviewing court should first determine the sufficiency of the evidence by considering the entirety of the evidence. State v. Marcantel, 2000-1629, p. 8 (La.4/3/02), 815 So.2d 50, 55 (citing State v. Hearold, 603 So.2d 731, 734 (La.1992)). Therefore, we will address sufficiency of the evidence first.
This Court set forth the applicable standard of review for sufficiency of the evidence in State v. Huckabay, 2000-1082, (La.App. 4 Cir. 2/6/02), 809 So.2d 1093, as follows:
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (La.App. 4 Cir.1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all the evidence most favorable to the prosecution must be adopted. The fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall; Green; supra. “[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence.” State v. Smith, 600 So.2d 1319 (La.1992) at 1324.
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson v. Virginia, supra, but rather an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La.1984).23 All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).
Huckabay, 2000-1082, p. 32, 809 So.2d at 1111 (quoting State v. Ragas, 98-0011, pp. 13-14 (La.App. 4 Cir. 7/28/99), 744 So.2d 99, 106-07).
The testimony of a single witness, if believed by the trier of fact, is sufficient to support a conviction. State v. Wells, 2010-1338, p. 5 (La.App. 4 Cir. 3/30/11), 64 So.3d 303, 306. A factfinder’s decision concerning the credibility of a witness will not be disturbed unless it is clearly contrary to the evidence. State v. James, 2009-1188, p. 4 (La.App. 4 Cir. 2/24/10), 32 So.3d 993, 996.
The elements of the crime for which defendant was convicted, second degree murder, a violation of La. R.S. 14:30.1, are not at issue. Rather, defendant argues that the evidence was insufficient to establish that he was the person who shot and killed the victim. Defendant argues that this case rises and falls on the time of the victim’s death. He maintains *589 that if the victim was killed after 5:30 a.m. on April 10, 2010, he could not have been the killer because he was at East Jefferson Hospital in Metairie receiving treatment for a gunshot wound to his leg.
The State’s theory of the case was that defendant shot and killed the victim in Ms. Spikes’ apartment, somewhere between 5:00 a.m. and 5:30 a.m., on April 10, 2010, when cell phone records and cell tower evidence show that defendant was in the vicinity of the apartment in eastern New Orleans. Following a thorough review of the record, we find that the evidence presented by the State is sufficient to support defendant’s conviction.
The medical experts in this case testified as to the difficulty in estimating the victim’s time of death. However, the State is correct that the three forensic pathologists who testified, two on behalf of the State and one on behalf of ^defendant, all stated that based on the physical evidence, they could not exclude the possibility that the victim was killed between 5:00 a.m. and 5:30 a.m.
Defendant’s cell phone records show that his cell phone pinged off cell towers close to or in eastern New Orleans from 4:45 a.m. until 6:07 a.m. In the interim, at 4:49 a.m., defendant’s cell phone pinged off the Michoud Boulevard tower in eastern New Orleans when he called Ms. Whitley and left a voice message. At 5:05 a.m. and 5:35 a.m. defendant’s cell phone pinged off the NASA cell tower. This thirty-minute period is when the State theorized that defendant killed the victim. Defendant’s cell phone records further demonstrated that after the 5:35 a.m. call, defendant remained in eastern New Orleans until a 6:07 a.m. call pinged off the Chef Menteur Highway cell tower. A 6:08 a.m. call from defendant’s phone to Ms. Spikes’ phone pinged off the Louisa Street tower. The next call from defendant’s phone, made at 6:10 a.m. to Mr. Brown’s cell phone, pinged off the Fair Grounds cell tower. It was in this phone conversation that defendant told Mr. Brown he “got into it” with the person messing with his “baby momma” and also that he had been shot. In the 7:25 a.m. phone conversation with Ms. Spikes, defendant told her that he had been shot and was talking to the police. This established that defendant was already at East Jefferson Hospital at 7:25 a.m., speaking with Dep. Hillburn.
Furthermore, the record is replete with evidence that contradicts defendant’s story that he was shot in the leg by Hispanic men after returning to his Metairie apartment complex. Dr. Traylor testified that given the characteristics of wound, and the fact that there was no bullet hole in defendant’s clothing, he opined that it was more probable that the gun discharged while defendant was carrying it. | ^Additionally, as described above, Det. Gray testified regarding numerous inconsistencies in defendant’s account of the parking lot shooting.
Viewing all evidence in the case in a light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt .that defendant shot and killed the victim, having the specific intent to kill or to inflict great bodily harm on him.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 1

Next, defendant argues that the trial court erred in denying him the right to cross examine Dr. Tracy, who performed the autopsy on the body of the victim, using a “learned treatise,” which evidence, defendant argues, was expressly admissible as an exception to the rule against hearsay under La. C.E. art. 803(18).
*590 Generally, the Sixth Amendment to the U.S. Constitution guarantees the right of an accused in a criminal prosecution “to be confronted with the witnesses against him.... ” The main and essential purpose of confrontation is to secqre the opportunity of cross examination. Davis v. Alaska, 415 U.S. 308, 315-16, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974). In addition, La. Const. Art. I, § 16 states, in pertinent part, that “[a]n accused is entitled to confront and cross-examine the witnesses against him....” La. C.E. art. 611(B) provides that a witness in a criminal case may be cross examined on any matter relevant to any issue in the case.
La. C.E. art. 803(18) states:
The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
[[Image here]]
(18) Learned treatises. To the extent called to the attention of an expert witness upon cross-examination or, in a civil case, relied upon by him |¾⅛ direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice. If admitted, such a statement may be read into evidence and received as an exhibit but may not be taken into the jury room.
In the instant case, defense counsel elicited from Dr. Tracy on cross examination that, as a pathologist, Dr. Tracy taught the subject matter and used the book, Medi-colegal Investigation of Death, by Werner Spitz. Dr. Tracy confirmed upon further cross examination that the book was considered to be “a preeminent book in [his] field” and was “the kind of book that many pathologists all over the country rely upon.” The State objected to defense counsel “putting a book into evidence.” Defense counsel responded by stating that it was a learned treatise, whereupon the court asked counsel to approach the bench, and an unrecorded bench conference was held. After the conclusion of the bench conference, defense counsel asked the court to note for the record her objection to not being allowed to use the treatise.
The State’s sole objection was to defense counsel’s putting the book in evidence. La. C.E. art. 803(18) refers to calling an expert witness’ attention to “statements contained in published treatises,” and states that “[i]f admitted, such a statement may be read into evidence and received as an exhibit....” However, the objection is fairly read as directed to the introduction into the record or reading “into evidence” of any portion of the treatise.
The State first argues that defendant failed to preserve the issue for appellate review as required by La. C.E. art. 103(A)(2), which states that error may not be predicated upon a ruling excluding evidence unless a substantial right of the party is affected, and “[w]hen the ruling is one excluding evidence, the substance of the [¡^evidence was made known to the court by counsel.” This requirement of La. C.E. art. 103(A)(2) contemplates, inter alia, the sort of procedure described in La. C.C.P. art. 1636, either permitting the party offering such evidence to either make a complete record thereof or permitting the party to “make a statement setting forth the nature of the evidence.” See, Pugh, Force, Rault & Triche, Handbook on Louisiana Evidence Law, Authors’ Note (4) to La. C.E. art. 103, p. 346 (2013).
In the instant case, after Dr. Tracy concluded his testimony, and during a break in the testimony, and with the jury out of the room, the trial court directed defense *591 counsel to perfect the record as to the earlier issue concerning the learned treatise with whatever argument or reasons given by defense counsel to be considered as -if given contemporaneously to the sustaining of the State’s objection — and to defense counsel’s notation of an objection to the trial court’s contemporaneous sustaining of that objection by the State. Defense counsel stated that the questions she would have asked of Dr. Tracy were to show that what the learned treatise said was “diametrically opposed to what the Doctor said on the stand.” Defense counsel further stated:
MS. BESKIND [DEFENSE COUNSEL]:
[W]hat Werner Spitz says is essentially that lividity is fixed after eight to ten hours. Therefore, it simply would not be possible to see the dual lividity on the body that Dr. Tracy testified to after more than ten hours from when the body is found, which was — is a very essential point from the defense.
THE COURT:
All right. That objection is preserved. You can supplement into the record [sic] whatever you, you know, what excerpt you wanted from the book. That objection’s preserved.
Defense counsel apparently never proffered any excerpts from the learned treatise she wished to use in cross examining Dr. Tracy. However, the trial court did not direct her to do so. Defense counsel clearly made a statement setting forth |2sthe substance of the part of the learned treatise with which she had planned to cross examine Dr. Tracy — essentially that lividity is fixed after eight to ten hours. Thus, the issue was properly preserved for review. That defense counsel did not proffer Dr. Tracy’s “expected” testimony is irrelevant. The learned treatise, more particularly the part of it that defense counsel sought to use in her cross examination, was the evidence excluded.
As to the merits of the assignment of error, the State argues that the trial court did not abuse its discretion in excluding the evidence. Generally, a trial court’s ruling as to the admissibility of evidence will not be disturbed absent an abuse of discretion. State v. Cyrus, 2011-1175, p. 20 (La.App. 4 Cir. 7/5/12), 97 So.3d 554, 565 (citing State v. Richardson, 97-1995, p. 14 (La.App. 4 Cir. 3/3/99), 729 So.2d 114, 122).
The State correctly asserts that although Dr. Tracy agreed on cross examination that the treatise was a preeminent book in the field and that he had used it, he also added: “[B]ut I would hate to see it in evidence.” The State argues that because of what it characterizes as Dr. Tracy’s “equivocation” (that he would hate to see the treatise in evidence), the trial court did not abuse its discretion in determining that the defense had not established through Dr. Tracy that the treatise was a “reliable authority.” It is not known precisely why the trial court refused to admit the evidence. While Dr. Tracy agreed that the treatise at issue was preeminent in its field and was “the kind of book that many pathologists all over the country rely upon,” he did express a reservation as to seeing the book in evidence. While the State objected at that point and Dr. Tracy did not further elaborate on why he “would hate to see it in evidence,” it cannot be said the trial |2flcourt abused its discretion in being of the opinion that Dr. Tracy did not believe the treatise was a “reliable authority” as contemplated by La. C.E. art. 803(18).
 Finally, even assuming the trial court erred in sustaining the State’s objection, confrontation errors are subject to the harmless error analysis. State v. *592 Scott, 2012-1603, p. 16 (La.App. 4 Cir. 12/23/18), 131 So.3d 501, 510-11; State v. Jones, 2012-0891 p. 35 (La.App. 4 Cir. 8/7/13), 122 So.3d 1065, 1084. An error is harmless if ⅜ can be said beyond a reasonable doubt that the guilty verdict rendered in the case was surely unattributable to that error. Scott, 2012-1603, p. 16, 131 So.3d at 510-11.
As noted by the State, during the cross examination of its rebuttal witness, expert forensic pathologist Dr. Traylor, defense counsel questioned him concerning email communications that defense counsel had with the doctor in advance of trial. Defense counsel noted that Dr. Traylor had faxed him information about lividity and rigor, including “a chapter from Spitz and Fisher,” a book that Dr. Traylor confirmed he taught in his class. Defense counsel further asked Dr. Traylor if the book, which counsel named as “The Medicolegal Investigation of Death,” was one of the most well-regarded treatises on the subject in the country. Dr. Traylor confirmed that it was, and he had earlier confirmed on cross examination that “Werner Spitz” was incredibly well-respected; that the treatise was a very good textbook; and that he liked it. Dr. Traylor stated that the chapter he faxed to defense counsel was on post-mortem changes, and the doctor confirmed that the chapter from the book stated that lividity is usually fixed after eight to twelve hours, but that those times were temperature dependent.
Defense counsel thoroughly cross examined Dr. Traylor about the estimates of the time of death based on lividity. The jury heard during the cross examination |snof State expert forensic pathologist Dr. Tracy, the name of the treatise as “Werner Spitz’s Fourth Edition Medicolegal Investigation of Death!,” before the trial court sustained- the State’s objection to the admissibility of the treatise. And the jury was extensively apprised of the time estimates concerning the fixing of lividity contained in that treatise, and the application thereof to the facts and circumstances of the victim’s deafh, during the testimony of Dr. Traylor.
In addition, Dr. Tracy’s final word on cross examination as to the time of the victim’s death was that his “best guess” was that the victim died somewhere in the middle of the range between 9:00 a.m. and 4:00 p.m., such as around 11:00 a.m. or 12:00 p.m., and that this conclusion was based entirely on lividity. A time of death of 12:00 p.m. would be eight hours before the victim’s body was discovered by authorities (after Ms. Spikes discovered it and called them). Defense counsel stated that the evidence from the learned treatise with which he wished to confront Dr. Tracy was that lividity becomes fixed at eight to ten hours. Thus, the ultimate “best guess” by Dr. Tracy as to the time of death, which, he said, was based exclusively on lividity, was entirely consistent with what defendant’s learned treatise said.
It is true that Dr. Tracy confirmed on redirect examination that he could not scientifically exclude the possibility that the victim was killed between 5:00 a.m. and 5:30 a.m. However, none of the three expert forensic pathologists who testified in the instant case, including defendant’s own expert, Dr. Trant, could exclude the possibility that the victim was killed between 5:00 a.m. and 5:30 a.m.
Thus, even if it were assumed that the trial court abused its discretion in sustaining the State’s objection to defense counsel’s use of the purported learned treatise in the examination of Dr. Tracy, considering all of the evidence, facts, and | si circumstances, it can be said beyond a reasonable doubt that the guilty verdict rendered in the instant case was surely *593 unattributable to any such error. Thus, any such error was harmless.

ASSIGNMENT OF ERROR NO. 2

Pursuant to the State’s request, the trial court instructed the jury on felony second degree murder pursuant to La. R.S. 14:30.1(A)(2), as well as murder based on specific intent to kill or inflict great bodily harm pursuant to La. R.S. 14:30.1(A)(1). Defendant submits that the trial court erred in instructing the jury as to felony second degree murder when the charge was not supported by the evidence. In order to convict defendant of felony second degree murder, the jury had to find beyond a reasonable doubt that he killed the victim while engaged in the perpetration or attempted perpetration of an aggravated burglary, even though he had no specific intent to kill or to inflict great bodily harm.
In requesting the felony murder charge, the State asserted that the evidence supported the charge of aggravated burglary because one of its theories was that defendant entered the home without authorization while armed and with the intent to commit an aggravated battery, a felony. Aggravated burglary is defined in pertinent part by La. R.S. 14:60 as the unauthorized entering of any inhabited dwelling where a person is present, with the intent to commit a felony or any theft therein, if the offender is armed with a dangerous weapon. Aggravated battery is the intentional use of force or violence upon the person of another where the force or violence is committed with a dangerous weapon. La. R.S. 14:33 (battery); La. RS. 14:34 (aggravated battery).
In ruling on the State’s request for the felony murder instruction, the trial court noted that the indictment charged only that defendant committed the crime of |S2second degree murder of the victim, without limitation as to the circumstances, and that the record contained no defense request for a bill of particulars as to the crime charged such that State might have been obligated to specify under which second degree murder theory it was prosecuting defendant.
La.C.Cr.P. art. 802(1) states that the court shall charge the jury “[a]s to the law applicable to the case.” In the present case, the evidence supports a conclusion that defendant made an unauthorized entry into Ms. Spikes’ apartment while armed with a dangerous weapon, and with the specific intent[5] to commit a felony. Thus, we find that the felony murder instruction was pertinent, and the trial court did not abuse its discretion in giving it. There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 3

In this assignment of error, defendant argues that the trial court erred in permitting the State to offer in rebuttal the testimony of forensic pathologist Dr. Traylor concerning the gunshot wound sustained by defendant — what' defendant characterizes as evidence on an issue not addressed by the defense in presenting its case.
La. C.E. art. 611(E) states that “the state in a criminal prosecution shall have the right to rebut evidence adduced by their opponents.” “Rebuttal evidence is that which is offered to explain, repel, counteract, or disprove facts given in evi *594 dence by the adverse party.” State v. Tyler, 97-0338, p. 17 (La.9/9/98), 723 So.2d 939, 948-49. The State may not reserve part of its case in chief for rebuttal testimony Rafter the defense has put on its case, when the defense can no longer present evidence to rebut the State’s case. State v. Turner, 337 So.2d 455, 458 (La.1976). The determination of what constitutes valid and admissible rebuttal evidence lies within the sound discretion of the trial court. State v. Huizar, 414 So.2d 741, 750 (La.1982). The trial court’s determination will not be disturbed except in extreme cases, such as where the evidence has been kept back deliberately for the purpose of deceiving and obtaining an undue advantage. State v. Amato, 96-0606, p. 20 (La.App. 1 Cir. 6/30/97), 698 So.2d 972, 987.
Shortly after Dr. Traylor, the State’s rebuttal witness, began testifying, the trial court ordered a short recess. During the recess, out of the presence of the jury and Dr. Traylor, defense counsel generally argued against permitting the State to present the testimony of Dr. Traylor, asserting that the State had the witness available and could have put him on in its case in chief, implying that the State had reserved part of its case in chief for rebuttal. Defense counsel noted that she had filed a pretrial motion in limine to bar the State from presenting improper rebuttal “argument.” Defense counsel proceeded to argue that the presentation of this rebuttal evidence by the State was not permitted by La.C.Cr.P. art. 774 and the jurisprudence interpreting that article. However, La.C.Cr.P. art. 774 addresses the scope of closing and rebuttal arguments, not the presentation of rebuttal evidence, which is covered by La. C.E. art. 611(E). In any case, the thrust of defense counsel’s argument on the issue at trial clearly was directed to rebuttal evidence, not rebuttal argument.
The State argued that the defense’s entire case was that defendant could not have killed the victim because of the time of the victim’s death. The State noted that it put on witnesses who testified that not only was defendant in the area of Ms. 134Spikes’ apartment, but also that defendant confessed (to State witness Searle Brown) to being out there and to having shot himself. The State then argued that:
Now, we are going to put on a guy who’s going to interpret the victim, the deceased, and we are going to put on a guy who’s going to back up the fact that our guy said — they just said he couldn’t be out there doing it. That the gun went off in his pants, stippling around the leg and the angle of the wound. That’s what we are going to put on.
Defense counsel argued that the defense put on no evidence in its case in chief concerning defendant’s gunshot wound and that the State had intentionally chosen to present Dr. Traylor on rebuttal to hamstring defendant from presenting a defense.
The trial court correctly noted that the defense made an issue in its earlier cross examination of a State witness that there was no blood evidence, no blood trail, from the murder scene in the second floor bedroom to the outside. The court also said that the State had a right to rebut the defense theory that the gunshot wound was sustained by defendant as a result of a drug deal with Mr. Brown, who testified on behalf of the State. The trial court further noted that the defense presented evidence through the testimony of defense witness Dr. Trant that there was a 95.5 percent certainty that the victim died after 12:00 p.m. on April 10, 2010. The court noted that the State introduced evidence that the killing occurred between 5:00 a.m. and 5:30 a.m., and to support its theory *595 that defendant killed the victim in that time frame, the State was introducing testimony that defendant sustained a gunshot wound to the leg.
It is undisputed that the defense theory, as to the gunshot wound, was that defendant was shot by a drug dealer, namely, State witness Mr. Brown, whom defendant allegedly had visited on the morning of April 10, 2010, to get some marijuana. Defense counsel expressly stated in her opening statement that all | .^defendant wanted to do after his “bad night” was to smoke some marijuana. Defense counsel further told the jury in her opening statement that defendant owed the marijuana dealer money, and when defendant showed up, he and the dealer got into an argument and the dealer shot him in the leg as a warning to pay up.
The State presented evidence in its case in chief, through the testimony of its last witness Mr. Brown, that defendant shot himself. Defense counsel cross examined Mr. Brown, who denied all assertions that he shot defendant in the leg during a drug deal
More than half of Dr. Traylor’s direct examination testimony on rebuttal was directed to rebutting the testimony of defense witness Dr. Trant as to the time the victim died. However, when the State got to the issue of the gunshot wound sustained by defendant, the prosecutor asked the doctor whether he, the prosecutor, had originally contacted the doctor about “some gunshot wounds.” Dr. Traylor replied in the affirmative. This response by Dr. Traylor evidences that the State had originally contacted Dr. Traylor to testify as to the gunshot wound, not the calculation of the time of the victim’s death.
Rebuttal evidence is “evidence which has become relevant or important only as an effect of some evidence introduced by the other side.” Turner, 337 So.2d at 458 (quoting State v. Smith, 120 La. 530, 532, 45 So. 415 (1908)). As noted, the State presented in its case in chief the testimony of Mr. Brown to establish that defendant accidentally shot himself at some point in connection with his confrontation with the victim. Neither of the two witnesses presented by defendant testified concerning the gunshot wound sustained by defendant. The two defense witnesses testified concerning evidence relevant to the time of death of the victim, and defendant elicited on cross examination testimony from Crime Scene [.^Technician Muhammad that there was no blood inside or outside Ms. Spikes’ apartment leading away from the scene of the murder. However, it cannot reasonably or fairly be said that the scientific testimonial evidence presented by the State on rebuttal through the testimony of Dr. Traylor — strongly tending to establish that the gunshot wound sustained by defendant could not have been inflicted by Mr. Brown but instead was accidentally self-inflicted — became “relevant or important only as an effect of some evidence introduced by” defendant.
In addition, essentially by the State’s own admission, the State originally contacted Dr. Traylor regarding the gunshot wound sustained by defendant, not the evidence relating to the time of the victim’s death. Thus, the record reflects that the State reserved part of its case in chief for rebuttal testimony, “contrary to statute, to ancient jurisprudence, and to rules of fair play.” Turner, 337 So.2d at 458. Dr. Traylor’s expert scientific testimony as to the gunshot wound clearly was not proper rebuttal evidence, and the trial court abused its discretion in permitting Dr. Traylor to give such testimony.
The State could have presented Dr. Traylor as its final witness in its case in *596 chief, after Mr. Brown, to testify as to the gunshot wound, and then brought Dr. Traylor back on rebuttal, after Dr. Trant testified for the defense, to rebut Dr. Trant’s testimony as to the time of death. Had Dr. Traylor so testified on direct examination about the gunshot wound, defense counsel could have questioned its expert, Dr. Trant, in the defense’s case in chief, concerning the gunshot wound.
Dr. Trant testified immediately before Dr. Traylor, and the defense knew, at the very latest, minutes after Dr. Traylor took the stand in rebuttal, that he was going to testify as to the gunshot wound. Yet, defense counsel apparently made no I37attem.pt to contact Dr. Trant to return to testify on surrebuttal on this issue. While defendant asserts in his brief that he “was further prejudiced by the trial court’s refusal to grant surrebuttal,” the record is devoid of any indication that defense sought surrebuttal or that the trial court denied defendant the right to surrebuttal.
Thus, in the instant case, there being no indication in the record that defendant sought to present surrebuttal evidence, the issue is whether the trial court’s erroneous ruling permitting the State to introduce on rebuttal scientific evidence concerning the gunshot wound was harmless.
Defense counsel thoroughly cross examined the State’s witness Mr. Brown and set forth the defense in her opening statement that a drug/marijuana dealer shot defendant. However, there was no evidence at all directly supporting such theory, nor was there any evidence from which that possibility could have been rationally inferred. In addition, defense counsel essentially conceded that defendant lied when he told several law enforcement officers on the day he received the bullet wound that a Hispanic male had shot him in his leg when defendant discovered several males breaking into his car in the parking lot of his Metairie apartment complex — a story not supported by any physical evidence in and around the parking lot.
Considering all of the facts and circumstances of the instant case, the guilty verdict rendered in the instant case was surely unattributable to the trial court’s error in permitting the State to present as rebuttal evidence, Dr. Traylor’s scientific testimony concerning defendant’s gunshot wound. Accordingly, there is no reversible error as to the instant assignment of error.

ASSIGNMENT OF ERROR NO. 4

|ssHere, defendant argues that the trial court erred in permitting the State to introduce particular evidence at trial the existence of which allegedly was not previously disclosed to him during discovery. That evidence was as follows: (a) the victim’s wallet; (b) photographs of the victim taken by the coroner’s investigator; (c) JPSO Det. Gray’s email memorandum to a superior memorializing his investigation; and (d) defendant’s statement made to Ms. Spikes at 7:25 a.m. on April 10, 2010.
Generally, “Louisiana’s criminal discovery rules are intended to eliminate unwarranted prejudice arising from surprise testimony and evidence, to permit the defense to respond to the State’s case, and to allow a proper assessment of the strength of the State’s case.” State v. Girard, 2012-0790, p. 4 (La.App. 4 Cir. 3/6/13), 110 So.3d 687, 690, writ denied, 2013-0795 (La.9/20/13), 123 So.3d 170.
Generally, under La.C.Cr.P. art. 718, as in effect at the time of the alleged commission of the offense for which defendant was indicted, and at the time of his prosecution *597 for such offense,[6] on motion of the defendant, the court was required to order the .district attorney to permit or authorize the defendant or his .expert to inspect, copy, examine, test scientifically, photograph, or otherwise reproduce, inter alia, papers, documents, photographs, and other tangible objects that were within the possession, custody, or control of the State and that: (1) were favorable to the defendant and that were material and relevant to the issue of guilt or |39punishment; (2) were intended for use by the State as evidence at the trial; or (3) were obtained from or belonged to the defendant.
Under La.C.Cr.P. art. 716(B), upon motion of the defendant, the court was required to order the district attorney to inform the defendant of the existence of, but not the contents of, any oral confession or statement of any nature made by defendant, which the district attorney intended to offer in evidence at trial — and information as to when, where and to whom any such .oral confession or statement was made.
La.C.Cr.P. art. 719 provides that upon motion by the defendant, the court shall order the district attorney to permit or authorize the defendant to inspect and copy, photograph or otherwise reproduce any results or reports, or copies thereof, of scientific tests or experiments made in connection with or material to the particular case, that are in the possession, custody, control, or knowledge of the district attorney and intended for use at trial. Exculpatory evidence shall be produced under the article even though it is not intended for use at trial.
In addition, “[u]nder well-established law, a prosecutor may not suppress evidence favorable to the accused and material to either guilt or punishment.” State v. Garcia, 2009-1578, p. 51 (La.11/16/12), 108 So.3d 1, 36, cert denied, — U.S. -, 133 S.Ct. 2863, 186 L.Ed.2d 926 (2013) (citing Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)).
Upon the State’s failure to comply with the discovery rules or with an order issued pursuant to the discovery rules, a court may prohibit the party from introducing into evidence the subject matter not disclosed, order a mistrial on motion of the defendant, or enter such other order, other than dismissal, as may be appropriate. La.C.Cr.P. art. 729.5(A). It is within the trial court’s discretion [40under La. C.Cr.P. art. 729.5 to exclude evidence or enter any appropriate order to remedy a party’s violation of a discovery right. State v. Bourque, 96-0842, p. 15 (La.7/1/97), 699 So.2d 1, 11; see also State ex rel. T.H., 2010-0962, p. 3 (La.App. 4 Cir. 11/24/10), 52 So.3d 275, 277 (a trial court has considerable discretion in rulings related to discovery and the dynamics of a trial).
The State does not dispute that defendant requested discovery to the fullest extent available to him under the law and that the trial court generally issued discovery orders directing the State to comply with defendant’s discovery requests.

(a) The victim’s wallet:

Defendant first complains that the State failed to divulge that it had in its possession the victim’s “wallet.” The victim’s mother, Ms. Shiloh, positively identi *598 fied what was described by the prosecutor as a “little plastic container” in which her son “kept all his belongings.”
In perfecting her objection, defense counsel described the wallet as an item that apparently was given to the victim’s mother by Ms. Spikes, presumably after the victim was killed. Defense counsel noted that there was no mention of the wallet anywhere in the police report and that the first the defense heard of it was when the State introduced it. The State gave no indication when it had come into possession of the wallet or whether it had intended all along to introduce it into evidence. The defense moved to exclude the wallet from introduction as evidence. The trial court simply noted the objection.
The State subsequently questioned Ms. Spikes about the wallet, handed it to her, and asked her to pull something out and go through it. She confirmed that those were the victim’s things. Ms. Spikes was then asked whether her apartment had been “tossed” or whether anything was missing from it, specifically the game fnconsole, and she replied in the negative as to those questions. There was no mention of anything of value that was inside of the victim’s wallet, or whether he usually had carried cash in it. However, the State clearly introduced the wallet and the other evidence that the apartment had not been ransacked to infer that robbery or burglary was not a motive in the break-in and killing of the victim. Further, NOPD Det. Morton testified that there was absolutely no sign that Ms. Spikes’ apartment had been burglarized, beyond the door having been forced open.
Defendant has failed to show that the trial court abused its discretion in refusing to exclude the introduction of the wallet in evidence, and even if there was an abuse of discretion, considering all of the facts and circumstances of the case, it was harmless error — the guilty verdict rendered in the case was not attributed to the introduction of the wallet. See State v. Robertson, 2006-1537, p. 9 (La.1/16/08), 988 So.2d 166, 172.

(b) Photographs of the decedent taken by the coroner’s investigator:

Defendant next complains that the State failed to turn over the photographs taken by the coroner’s investigator. The photographs were not produced at trial. Their existence first came to light during the State’s redirect examination of its forensic pathologist expert, Dr. Tracy, when the State questioned Dr. Tracy as to whether, when he met with defense counsel, they showed him any “slab” photographs or photographs of the body of the deceased. Dr. Tracy did not recall. The prosecutor then asked Dr. Tracy whether it was true that when he, the prosecutor, met with him, he, Dr. Tracy, pulled some photographs of the lividity, or redness, in the victim’s chest, something which, Dr. Tracy confirmed, “helps you come to that determination.” Dr. Tracy confirmed that the defense did not show him any such photographs because he got them from his office. At that point |42defense counsel asked to approach the bench, and an unrecorded bench conference was held. When the prosecutor subsequently asked Dr. Tracy whether the photographs had been taken on the scene by the coroner’s office, Dr. Tracy replied that was what he had been told.
On re-cross examination, Dr. Tracy said that, to the best of his recollection, he pulled the photos in question from “the file” while he was there with the prosecutors. Dr. Tracy confirmed on re-cross examination that, to the best of his knowledge, the prosecutor did not have the photographs before that time. That concluded Dr. Tracy’s testimony.
*599 The photos in question were not produced at trial. They were not shown to Dr. Tracy during his testimony. They were not introduced in evidence. The record reflects no contemporaneous objection by the defense as to these photographs, although during Dr. Tracy’s redirect examination concerning the photographs, defense counsel asked to approach the bench, and an unrecorded bench conference was held. It is not known whether an objection was voiced by defendant at that time. However, Ms. Spikes followed Dr. Tracy as a witness. Defense counsel made no mention of the photographs during a break in Ms. Spikes’ testimony when earlier contemporaneous defense objections were perfected by defense counsel. Accordingly, under these circumstances, it cannot be said that defendant preserved this issue for review. La.C.Cr.P. art. 841(A)(“An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence.”).
Even assuming it can be inferred from defense counsel’s request to approach the bench and the following unrecorded bench conference that defense counsel did lodge an objection to the State’s failure to disclose the existence of the photographs taken by coroner’s office investigators, and further assuming that defendant was | ^entitled to such photographs, any error in the State failing to disclose them was harmless. Dr. Tracy testified on cross examination that he could not exclude the possibility that the victim died after 9:00 a.m.—which is what he had originally told defense counsel, before discussing the case with prosecutors and pulling the photos from the coroner’s office files. Dr. Tracy further ultimately confirmed on cross examination that his best guess was that the victim died somewhere in the middle of the range between 9:00 a.m. and 4:00 p.m., such as around 11:00 a.m. or 12:00 p.m., which was even more advantageous to defendant’s defense theory than a time of death at 9:00 a.m.
Thus, it can be said beyond a reasonable doubt that the guilty verdict rendered in the instant case was surely unattributable to any error in the State’s failure to disclose the photographs to the defense.

(c) JPSO Det. Gray’s memorandum/report emailed by him to his superiors, memorializiny his investigation:

This issue concerns the JPSO’s investigation of the circumstances surrounding defendant sustaining a gunshot wound in his leg. Defendant asserts that the State turned over a copy of the JPSO supplemental report dated June 12, 2010, but did not provide JPSO Det. Gray’s initial memorandum, which he provided to his supervisors via email on April 10, 2010.
JPSO Det. Gray testified that in the investigation bureau detectives do not write the same “reports” that a JPSO deputy responding to a call would write. He said he writes an internal memorandum that he submits on the date of occurrence to everyone in his chain of command, which he said he did after he investigated the circumstances surrounding defendant’s sustaining of the gunshot wound. When the NOPD requested his “report” in the case, Det. Gray testified that he basically |44copied what he wrote in his initial memorandum into an official JPSO supplemental report and gave it to NOPD Homicide.
The trial court strongly chastised the State for not turning over to the defense this initial email memorandum sent by Det. Gray to his superiors. A recorded bench conference was held during a jury break at which this issue was discussed. The trial court stated that it was not going to let the email memorandum in evidence because it was not provided to the defense, *600 but it was still ordering the State to produce a copy of it to the defense. Defense counsel asked for a moment to review the document. The tail end of the bench conference colloquy between defense counsel and the court was as follows:
MS. BESKIND [DEFENSE COUNSEL]:
Judge, as I understand your ruling on the report, your ruling was that the State got to introduce the mail showing that the report had been sent contemporaneously with the detective’s investigation that day and that we have a moment to review the report to see if there’s any additional—
THE COURT:
Sure.
MS. BESKIND:
—information we’d like to cross on, but, barring that the report may not be used by the State.
THE COURT:
That’s correct.
THE COURT:
All right. Lets [sic] bring the jury down.
MS. GARVEY [DEFENSE' COUNSEL]:
We’ve reviewed the report and we are not going to recross—
THE COURT:
Okay.
MS GARVEY:
Lb — the detective, so we’d ask that—
THE COURT:
Then you’re satisfied there’s nothing materially new in there?
MS. BESKIND:
Yes, Judge, and so accordingly we’d ask that the State not be allowed to go into any more questions on this.
THE COURT:
All right.
MR. MYERS:
I’m just going to [sic] that email receipt and that’s it. . Can I ask one more question on the email receipt?
THE COURT:
Yeah, that’s fine....
Thus, it is clear that the matter was resolved to the satisfaction of both defense counsel, Ms. Beskind and Ms. Garvey. Defendant cannot now complain of any prejudice due to the State’s failure to turn over Det. Gray’s internal memorandum prior to trial.

(d) Defendant’s statement made to Ms. Spikes at 7:25 a.m. on April 10, 2010:

Defendant lastly complains that the State failed to turn over a statement he allegedly made to Ms. Spikes during a telephone conversation at approximately 7:25 a.m. on April 10, 2010. Defense counsel objected to the testimony concerning the telephone conversation, arguing that it only came to light at trial. Following a bench conference, the trial court essentially ruled that Ms. Spikes could testify as to the substance of the call because the jury had been apprised of these facts in the State’s opening statement and that it was the same thing defendant had said to detectives. We find no error in this ruling.
When Ms. Spikes resumed her testimony, she related that during the phone call she made to defendant that morning (seeking to have defendant return her car |4fito her), he told her that he could not talk with her because he had been shot and was talking to the police. Ms. Spikes also testified that she saw defendant later that day at her mother’s home when he returned her car. The prosecutor asked Ms. Spikes if defendant told her, in that later conversation, how he had gotten shot. Ms. Spikes stated defendant told her he was *601 shot by Mexicans who were attempting to break into his car at the Metairie apartment complex. Defense counsel did not object to this portion of Ms. Spikes’ testimony.
There is no merit to any part of the instant assignment of error insofar as there being reversible error.

ASSIGNMENT OF ERROR NO. 5

In his fifth assignment of error, defendant argues that the trial court erred in permitting Det. Gray to testify to hearsay statements made by defendant’s sister, Ms. Hatfield.
JPSO Det. Gray testified that while he was at East Jefferson Hospital investigating the report of a patient presenting with a gunshot wound, he spoke with Ms. Hatfield. The prosecutor asked whether the detective was able to ascertain whether Ms. Hatfield saw defendant that night. At that point defense counsel raised a hearsay objection. The trial court overruled the objection, expressly stating: “It’s part of his investigation.”
According to Det. Gray’s testimony, Ms. Hatfield claimed she last saw defendant around 4:00 p.m. the previous afternoon on April 9, 2010. Det. Gray explained that this information did not correlate with what defendant told him, i.e., defendant went to his sister’s apartment around 4 a.m. on April 10, 2010, knocked on the door (because he did not have a key) and his sister allowed him inside. Ms. Hatfield further told Det. Gray that she had arrived home at approximately 3:00|47a.m. on April 10, 2010 and that she did not hear a knock on her door or let defendant in her apartment.
Hearsay is a statement, other than one made by the declarant while testifying in the present trial or hearing, offered in evidence to prove the truth of the matter asserted. La. C.E. art. 801(C). “Hearsay is excluded because the value of the statement rests on the credibility of the out-of-court asserter who is not subject to cross-examination and other safeguards of reliability.” State v. Martin, 2013-0115, p. 10 (La.App. 4 Cir. 12/4/13), 131 So.3d 121, 128 (quoting State v. Everidge, 96-2665, p. 7 (La.12/2/97), 702 So.2d 680, 685).
In certain circumstances, the testimony of a police officer may encompass information provided by another individual without constituting hearsay if it is offered to explain the course of the police investigation and the steps leading to the defendant’s arrest. Cyrus, 2011-1175, pp. 20-21, 97 So.3d at 565-66; see also State v. Smith, 400 So.2d 587, 591 (La.1981) (testimony of officer that he was advised of a shooting incident was not hearsay because it was not offered to prove the truth of matter asserted, but was offered to explain why, having received this information, the officer began an investigation); State v. Monk, 315 So.2d 727, 740 (La.1975) (deputy’s testimony not hearsay when offered solely for the purpose of establishing the fact that he received a radio message that a robbery had been committed at a bank by two men who left on a motorcycle; it was not offered to prove the truth of its content, but rather, that the utterance occurred).
However, the Louisiana Supreme Court has warned that the State should not be allowed to use a law enforcement officer as a “passkey” to present inadmissible hearsay evidence to the jury in the guise of “explaining police actions.” State v. Hearold, 603 So.2d 731, 737 (La.1992). In State v. Wille, 559 So.2d 1321, 1331 (La.1990), the court stated:
Admission of information received by a police officer in the investigation of a crime, on the basis that such information explains the officer’s presence and conduct and therefore does not constitute *602 hearsay evidence, is an area of widespread abuse. McCormick on Evidence § 249 (E. Cleary 3d ed.1984). Such information frequently has an impermissible hearsay aspect as well as a permissible nonhearsay aspect, and the court in determining admissibility should balance the need of the evidence for the proper purpose against the danger of improper use of the evidence by the jury. Id. The fact that an officer acted on information received in an out-of-court assertion may be relevant to explain his conduct, but this fact should not become a passkey to bring before the jury the substance of the out-of-court information that would otherwise be barred by the hearsay rule. G. Pugh, Louisiana Evidence Law 429-431 (1974).
When an out-of-court statement, such as information received by a police officer during an investigation of a crime, has both an impermissible hearsay aspect and a permissible nonhearsay aspect, the issue of relevancy becomes significantly interrelated with the hearsay issue. If the nonhearsay content of the statement has little or no relevance, then the statement should generally be excluded on both relevance and hearsay grounds. Marginally relevant nonhear-say evidence should not be used as a vehicle to permit the introduction of highly relevant and highly prejudicial hearsay evidence which consists of the substance of an out-of-court assertion that was not made under oath and is not subject to cross-examination at trial.
While Det. Gray’s testimony as to what Ms. Hatfield told him was relevant to show the course of the JPSO investigation, it was also relevant and highly prejudicial to the defense’s theory that defendant returned to the apartment that morning to get money to purchase marijuana, and left the apartment with his iPod.
Generally, a trial court’s ruling as to the admissibility of evidence will not be disturbed absent a clear abuse of discretion. Cyrus, 2011-1175, p. 20, 97 So.3d at 565 (citing Richardson, 97-1995, p. 14, 729 So.2d at 122).
It appears that the trial court abused its discretion in admitting the evidence. However, the erroneous admission of hearsay evidence is subject to the harmless error analysis. State v. Hugle, 2011-1121, p. 28 (La.App. 4 Cir. 11/7/12), 104 So.3d 598, 618, writ denied, 2012-2721 (La.6/14/13), 118 So.3d 1079. An error is harmless if it can be said beyond a reasonable doubt that the guilty verdict rendered in the case was surely unattributable to that error. Scott, 2012-1603, p. 16, 131 So.3d at 510-11.
Considering all of the facts and circumstances in the instant case, noting that defendant lied in giving a completely false story to both the JPSO and the NOPD concerning how he sustained the gunshot wound; the time line of phone calls, including the thirteen-minute call he placed to Mr. Brown’s telephone at 6:10 a.m. when he was near the Fair Grounds, before he subsequently presented to East Jefferson Hospital with a gunshot wound; the admissions defendant made to Mr. Brown in that phone call; and all the other evidence in the case — it can be said beyond a reasonable doubt that the guilty verdict rendered in the instant case was surely unattributable to the trial court’s error in admitting the hearsay testimony of Det. Gray as to what Ms. Hatfield told him.
Defendant also argues on appeal that the admission of the hearsay testimony by Det. Gray violated his constitutional confrontation rights. However, the record reveals that at trial, defendant only object *603 ed to the introduction of the evidence on the ground of hearsay.
A defendant must make a contemporaneous objection “to a claimed confrontation violation” in order to preserve it for appellate review. State v. Vallo, 2013-1369, p. 4 (La.1/10/14), 131 So.3d 835, 837. The contemporaneous objection rule, La. C.Cr.P. art. 841(A), not only provides that “[a]n irregularity or error cannot be availed of after verdict unless it was objected to at the time of the occurrence,” the rule also requires that a defendant state the grounds for the objection. State v. Marlowe, 2010-1116, p. 35 (La.App. 4 Cir. 12/22/11), 81 So.3d 944, 965-66. Further, a defendant is limited on appeal to those grounds articulated at trial. State v. Ott, 2010-1307, p. 13 (La.App. 4 Cir. 1/5/12), 80 So.3d 1280, 1287.
Given that defendant made no objection as to the denial of his right-to-confrontation as to the hearsay statement, he cannot raise that issue on appeal.
There is no reversible error as to the instant assignment of error.

ASSIGNMENT OF ERROR NO. 6

In his sixth assignment of error, defendant argues that the trial court erred in denying his motion to exclude from evidence the testimony of Searle Brown, who testified that defendant telephoned him at 6:10 a.m. on April 10, 2010, and told him that he had gotten into it with the person who was messing with his “baby mama,” and that he, defendant, had accidentally shot himself.
Defendant filed a motion on Friday, October 19, 2012 — with trial set to begin the following Monday, October 22, 2012 — to exclude Mr. Brown’s testimony, arguing that it had only learned of the testimony late on the afternoon of the previous day. Defendant’s motion to exclude the testimony of Mr. Brown was denied.
La.C.Cr.P. art. 716(B) states that upon written motion by the defendant, the court shall order the district court to inform the defendant of the existence, but not the contents, of any oral confession or statement of any nature made by defendant that the district attorney intends to offer in evidence at trial, with the information as to when, and to whom such oral confession or statement was made. The State is under a continuing duty to disclose such information to the defendant. La.C.Cr.P. art. 729.3. Pursuant to La.C.Cr.P. art. 729.5, authorizing sanctions for violations of discovery rules, had the trial court found that the State failed to comply with the | .-^requirements of La.C.Cr.P. art. 716(C) and 729.3, it could have prohibited the State from introducing the testimony of Mr. Brown as to the statements made to him by defendant.
In the instant case, in reply to a question from the prosecutor during its direct examination of Mr. Brown at trial, he confirmed that they had not spoken and had never met until the prior week. Mr. Brown further confirmed on cross examination that the very first time he came forward with the story had been the previous Thursday, which would have been October 18, 2012, the day on which the State notified defendant in the afternoon of the existence of the statement, perhaps even the content. Mr. Brown’s parole officer, Tonya Ramsey, confirmed in her testimony that she received a phone call from the district attorney’s office the week prior to trial and was asked to contact Mr. Brown.
In State v. Johnson, 380 So.2d 32 (La.1980), a homicide case, a situation similar to the one in the instant case presented itself. On Friday, March 30, 1979, the State learned for the first time that at the time of his arrest, the defendant had disclosed the location of the murder weapon to a police officer. A notice of the State’s *604 intention to offer the statement in evidence, containing the substance of the statement (required by La.C.Cr.P. art. 716(C)) was placed in defense counsel’s box in the parish clerks’ office that same day. However, the notice was not received by defense counsel until Monday, April 2, 1979, the day on which the defendant’s trial was set to begin. As it turned out, trial did not commence until Wednesday, April 4,1979. The trial court admitted the statement over the objection of the defense counsel, which objection was that the State did not inform him of the statement in its original answer to the defense discovery request.
|s2On appeal, the Louisiana Supreme Court found that the assistant district attorney involved had acted in good faith and had no knowledge of the statement prior to Friday, March 30, 1979. The court noted that the State had disclosed the statement the same day it learned of it, and that, although defense counsel did not receive the notice until the following Monday, defense counsel had actual notice two days before the commencement of trial. The court also noted that counsel had not requested a continuance. The court found that the State had “substantially” complied with La.C.Cr.P. arts. 716(C) and 729.3, and that the trial court had not abused its discretion in overruling the defendant’s objection to the introduction of the evidence, or in failing to grant the mistrial requested by the defendant.
In State v. Fisher, 380 So.2d 1340 (La.1980), the State informed the defendant on February 21, 1979 of its intent to offer in evidence an oral confession she had made and on March 8, 1979 of its intent to offer in evidence another oral statement she made. On March 13, 1979, just prior to opening statements, the State informed the defendant of its intent to offer in evidence a statement she made to a deputy some four months prior to the crime, a summary of the statement being attached to the notice motion. A district attorney’s office investigator testified at a hearing that he learned from a deputy on March 12, 1979 that another deputy knew of a statement that might prove helpful at trial. The investigator learned of the content of the statement the following day, March 13, 1979, after which he immediately advised the prosecutor. The two deputies confirmed the investigator’s story. The trial court denied the defendant’s motion for a mistrial and denied the defendant’s motion for continuance.
On appeal, the Louisiana Supreme Court in Fisher found that the State had acted in good faith and had no knowledge of the statement prior to coming into | ^possession of it on March 13, 1979, whereupon it immediately informed the defendant of it. The court held that, under the circumstances, the State had “substantially” complied with La.C.Cr.P. arts. 716(C) and 729.3, and that the trial court did not abuse its discretion in denying the defendant’s motion for mistrial and motion for continuance.
In the instant case, defendant does not question that the State gave his trial counsel notice of the statement late on the afternoon of Thursday, October 18, 2012, the same day it learned of it from Mr. Brown. It might be assumed that the motion to continue that was denied by the trial court on Friday, October 19, 2010, three days prior to trial, was a motion to continue filed by defendant. However, while defendant argues on appeal that because of the late disclosure the defense did not have time to investigate the possible bias and motivations of Mr. Brown to cooperate with the State, or to seek witnesses or other evidence that could have contradicted and challenged Mr. Brown’s version of the facts, defendant does not argue that *605 the trial court erred in denying any motion to continue that might have been filed by him.
Under the circumstances, it cannot be said that the trial court abused its great discretion in discovery matters in denying defendant’s motion to exclude Mr. Brown’s testimony as to what defendant said to him. As in Johnson, supra, and Fisher, supra, it can fairly be said that the State substantially complied with La.C.Cr.P. art. 719(B) and 729.3.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 7

In this assignment of error, defendant argues that the trial court erred in sustaining a State objection and preventing the defense from asking Mr. Brown | Mabout an alleged open warrant for his arrest that existed at the time he testified at trial and in sustaining a State objection and preventing the defense from cross examining Ms. Whitley as to an alleged pending felony charge.
Defendant does not point to any place in the record that substantiates his assertion that Mr. Brown had an open warrant for his arrest or that Ms. Whitley had a pending felony charge against her.
During cross examination of Ms. Whitley, defense counsel asked whether she had her own court case that day. The State objected. The objection was sustained. Defense counsel asked to approach the bench. An unrecorded bench conference was held, after which the trial court directed that trial proceed.
Extrinsic evidence to show a witness’s bias or interest is admissible to attack the credibility of the witness. La. C.E. art. 607(D). La. C.E. art. 609.1(A) provides that, in a criminal case, every witness by testifying subjects himself to examination relative to her criminal convictions. However, generally, only offenses for which the witness has been convicted are admissible upon the issue of the witness’s credibility, and no inquiry is permitted into matters for which there has only been an arrest, the issuance of an arrest, an indictment, a prosecution, or an acquittal. La. C.E. art. 609.1(B).
However, “[djenying an accused the right to cross-examine a state’s witness as to a pending criminal charge in order to show possible bias may deny him not only his right of cross-examination, but also his constitutional right of confrontation.” Pugh, Force, Rault & Triche, Handbook on Louisiana Evidence Law, Authors’ Note (2) to La. C.E. art. 609.1, p. 564 (2013). Encompassed in the right of confrontation is the right of the accused to impeach a witness for bias or interest; the right to expose a witness’s motivation in testifying is a proper and | .^important function of the constitutionally protected right of cross examination. State v. Lawrence, 2008-0397, p. 9 (La.App. 4 Cir. 2/4/09), 5 So.3d 896, 902.
“It is well-settled that ‘[a] witness’s bias or interest may arise from arrests or pending criminal charges, or the prospect of prosecution, even when he has made no agreements with the state regarding his conduct.’ ” State v. Burbank, 2002-1407, p. 2 (La.4/23/04), 872 So.2d 1049, 1050 (quoting State v. Vale, 95-1230, p. 4 (La.1/26/96), 666 So.2d 1070, 1072). A witness’s “hope or knowledge that he will receive leniency from the state is highly relevant to establish his bias or interest.” Vale, 95-1230, p. 4, 666 So.2d at 1072 (quoting State v. Brady, 381 So.2d 819, 822 (La.1980)). “The possibility that the prosecution may have leverage over a witness due to that witnesses] pending criminal charges is recognized as a valid area of cross-examination.” Burbank, 2002-1407, *606 p. 2, 872 So.2d at 1050 (quoting State v. Rankin, 465 So.2d 679, 681 (La.1985)).
In the case of Ms. Whitley, she corroborated Ms. Spikes’ testimony regarding the events that occurred in the early morning hours of April 10, 2010. Ms. Whitley confirmed that defendant followed her vehicle that morning until she and Ms. Spikes’ were able to evade him, and that defendant called Ms. Spikes’ numerous times during those early morning hours. Ms. Whitley also testified that defendant called and left a voicemail message on her cell phone. A recording of that voicemail was identified by Ms. Whitley and was played for the jury.
Generally, a trial court’s ruling as to the admissibility of evidence will not be disturbed absent an abuse of discretion. Cyrus, supra. Ms. Whitley was Ms. Spikes’ close friend, whom she had known, for sixteen years. If she was going to testify falsely against defendant, who had mistreated Ms. Spikes and possibly murdered Ms. Spikes’ boyfriend, one can surmise that their close friendship would l.^have been an overriding motive to do so. Thus, the trial court could have reasonably concluded that the probative value of any evidence of such a pending charge against Ms. Whitley was minimal, and that defendant’s constitutional right to confrontation did not require that the general rule that only evidence of convictions is admissible to attack the credibility of a witness in a criminal case be dispensed with.
Assuming for the sake of argument that the trial court did err in sustaining the State’s objection to cross examination of Ms. Whitley as to a pending charge of aggravated battery, confrontation violations are subject to harmless error analysis. Scott, supra; Jones, supra.
For the reasons discussed above, and noting that the most damaging piece of testimony by Ms. Whitley related to the voicemail message left by defendant on her cell phone, a fact supported by independent evidence, it can be said beyond a reasonable doubt that the guilty verdict actually rendered in the instant case was surely unattributable to any such error.
As to the defendant’s complaint that the trial court erred in sustaining the State’s objection to the cross examination of Mr. Brown as to whether he then had a warrant out for his arrest. The State represents that Mr. Brown’s “open warrant” was for failure to pay fines and fees in Baton Rouge. Mr. Brown admitted to prior convictions for forgery and possession of cocaine, and he was on parole. Importantly, Mr. Brown’s parole officer, Officer Ramsey, replied in the negative when asked on direct examination whether she ever had to violate Mr. Brown’s parole, and as to whether he had done anything to violate his parole in the three years she had been supervising him. The defense had no questions for Officer Ramsey.
|fi7If the matter of which defense counsel sought to question Mr. Brown about was serious enough to undermine his credibility, it can be presumed that his parole officer would have known of it and that it would have constituted a parole violation. This supports the State’s representation in its appellate brief that the matter concerned only Mr. Brown’s failure to pay fines and fees in Baton Rouge. Defendant has failed to show that the trial court abused its discretion in sustaining the State’s objection as to the question concerning whether Mr. Brown had a warrant outstanding for his arrest.
Even assuming that the trial court abused its discretion in sustaining the State’s objection, considering the State’s representation that the supposed “open warrant” was for Mr. Brown’s failure to pay fines and fees in Baton Rouge; that he *607 was on parole; that his parole officer confirmed that he had never violated the terms of his parole; and all of the other facts and circumstances of the case, it can be said beyond a reasonable doubt that the guilty verdict actually rendered in the instant case was surely unattributable to any such error.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 8

In this assignment of error, defendant argues that his due process rights to a fair trial were violated when the State failed to provide the defense with the cell phone records of the victim. Defendant asserts that the records contained exculpatory evidence which would have impeached the testimony of the victim’s mother, Ms. Shiloh, and Ms. Spikes on the issue of telephone calls they claimed to have made to the victim on the day he was killed.
Defendant’s trial counsel objected after the verdict was rendered, claiming that she first learned of the existence of the victim’s phone records mid-trial, [^noting that the records were not introduced at trial, but arguing that they should have been turned over by the State during discovery. At the time this objection was raised, defense counsel stated that “[w]e believe that it’s certainly possible that they contained exculpatory information from our brief ability to peruse them.”
Defendant’s appellate counsel adopts the arguments on this issue that were set forth in defendant’s motion for new trial. In defendant’s motion for new trial, it was asserted that the defense first learned of the existence of the victim’s cell phone records “as they were being identified by the witness, Detective Morton.” However, the record reflects that during his testimony, Det. Morton identified only the cell phone records for defendant and for Ms. Spikes. As to any cell phone records for the victim, Det. Morton confirmed during his cross examination by defense counsel that he never obtained a subpoena for the victim’s phone records. Det. Morton testified further that, if he recalled correctly, he was advised by family and Ms. Spikes that the victim did not have a cell phone. The detective said that was in the police report.
The record — the trial transcript and minute entries — reflects that the only cell phone records introduced at trial were those of defendant and Ms. Spikes. The record does not contain any phone records for the victim.
Defendant’s trial counsel referred to the purported content of the victim’s cell phone records when making an objection after the rendition of the verdict and in the motion for new trial. Defendant’s appellate counsel refers to the records in defendant’s appellate brief. However, the representations as to the content of the record cannot be verified because they are not in the record. If defense counsel had them at the time she made her objection after the verdict was rendered, she should have proffered a copy for the record on appeal.
| S9On the showing made, there is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 9

Finally, defendant argues that the trial court erred in denying his request for a jury instruction that to convict him the jury had to render a unanimous verdict of guilty. Defendant correctly notes that the guilty verdict rendered in the instant case was by a 10-2 vote.
Defendant filed a pretrial motion on July 26, 2012, to declare La.C.Cr.P. art. 782(A) and La. Const, art. 1, § 17(A) unconstitutional. The trial court denied the motion on October 22, 2012.
*608 La.C.Cr.P. art. 782(A) provides, in pertinent part: “Cases in which punishment is necessarily confinement at hard labor shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict.” La. Const. art. 1, § 17(A), the source for La.C.Cr.P. art. 782(A), provides in pertinent part: “A case in which the punishment is necessarily confinement at hard labor shall be tried before a jury of twelve persons, ten of whom must concur to render a verdict.”
Defendant argues that the Sixth Amendment to the U.S. Constitution required a unanimous verdict. However in the most recent pronouncement on the issue by the United States Supreme in McDonald v. City of Chicago, Ill., 561 U.S. 742, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010), the Court reaffirmed the continuing viability of its forty-year old plurality decision (with one judge concurring and four dissenting) in Apodaca v. Oregon, 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972), in which it held that the Sixth Amendment right to trial by jury did not require unanimity in jury verdicts in state criminal trials. See McDonald, 561 U.S. at 766, 130 S.Ct. at 3035, fn. 14 (“The Court has held that although the Sixth |6(>Amendment right to trial by jury requires a unanimous jury verdict in federal criminal trials, it does not require a unanimous jury verdict in state criminal trials.”).
Both this Court and the Louisiana Supreme Court have soundly rejected the argument put forth by defendant in the instant case, basing such decisions on controlling jurisprudence. See State v. Bertrand, 2008-2215, 2008-2311, p. 8 (La.3/17/09), 6 So.3d 738, 743; State v. Hankton, 2012-0375, p. 7 (La.App. 4 Cir. 8/2/13), 122 So.3d 1028, 1031-32, writ denied, 2013-2109 (La.3/14/14), 134 So.3d 1193.
There is no merit to this assignment of error.
DECREE
For the foregoing reasons, the defendant’s conviction and sentence are affirmed.
AFFIRMED.
BONIN, J., concurs with reasons.

. State v. Prieur, 277 So.2d 126 (La.1973).

. State v. Hatfield, 2012-0077 (La.App. 4 Cir. 2/22/12), unpub.

. Miranda v, Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. Mr. Brown was on parole since 2009 for his 2007 convictions for forgery and drug possession. He admitted two other prior convictions from 2001 and 2003, respectively, for possession of cocaine and for issuing a check with insufficient funds.

. "Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.” La. R.S. 14:10(1). "Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant.” State v. Jones, 2010-0762, pp. 5-6 (La.9/7/11), 74 So.3d 197, 201.

. All of the discovery articles in the Louisiana Code of Criminal Procedure addressing discovery by the defendant were amended by Acts 2013, No. 250, § 1, with the Act expressly providing for prospective application only of the amended provisions from its January 1, 2014 effective date — unless stipulated otherwise in each particular case, in writing, on the record, by the district attorney and the defendant.