STATE OF LOUISIANA     *      NO. 2024-KA-0454

VERSUS     *

TYRONE A. STEWART     *     COURT OF APPEAL

    *     FOURTH CIRCUIT

    STATE OF LOUISIANA

    * * * *
    * * *

APPEAL FROM
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. 554-289, SECTION "J"
Honorable Darryl A. Derbigny
* * * * * *
**Judge Monique G. Morial**
* * * * * *

(Court composed of Judge Daniel L. Dysart, Judge Rosemary Ledet, Judge Monique G. Morial)

Jason Rogers Williams
DISTRICT ATTORNEY
ORLEANS PARISH

Patricia Amos
Assistant District Attorney
619 South White Street
New Orleans, LA 70119

Zachary M. Phillips

    COUNSEL FOR STATE/APPELLEE

Jane Hogan
ATTORNEY AT LAW
310 N. Cherry Street, Suite 1
Hammond, LA 70403

    COUNSEL FOR DEFENDANT/APPELLANT

       **AFFIRMED**
       **MAY 14, 2025**

*MGM*

*DLD*

*RML*

Defendant, Tyrone Stewart, ("Defendant"), appeals his April 28, 2023 conviction for second-degree cruelty to a juvenile in violation of La. R.S. 14:93.2.3. For the following reasons, we affirm Defendant's conviction and sentence.

## Statement of the Case

Defendant and Andrielle Jones, were arrested on December 6, 2021, for crimes committed on or about October 5, 2021 through October 7, 2021. On May 10, 2022, the Orleans Parish District Attorney charged the Defendant with one count of second-degree cruelty to a juvenile pursuant to La. R.S. 14:93.2.3(A)1. Ms. Jones was charged with cruelty to a juvenile pursuant to La. R.S. 14:93. On June 28, 2022, Ms. Jones pled not-guilty. Defendant also pled not-guilty on August 16, 2022. The State filed a motion to sever the defendants, which the trial court granted on October 11, 2022. A five-day jury trial commenced on April 24, 2023, as to the Defendant only. At the conclusion of trial, the jury found Defendant guilty of second-degree cruelty to a juvenile.

1

On December 5, 2023, the trial court sentenced Defendant to forty years (40) at hard labor. Defendant's motion for new trial was denied on the same day as sentencing. Several months later, the trial court denied Defendant's motion to reconsider sentence. This appeal followed.

**Facts**

On or about October 7, 2021, the then four-year old victim. D.S.[1], presented to University Medical Center ("UMC") emergency room suffering burns to her head, neck, and back. The doctors at UMC quickly deduced that the severity of D.S.'s condition required specialized treatment. D.S. was in acute kidney and renal failure upon arrival to UMC, with severe facial swelling. D.S. was then transferred to the pediatric intensive care unit ("PICU") at Children's Hospital of New Orleans ("Children's"). The day after her admission to Children's and during an examination of D.S.'s injuries, Dr. Kopari, a pediatric burn specialist, shaved D.S.'s hair to determine the demarcation and severity of the burns. Dr. Kopari discovered a full thickness burn, or third-degree burn, beginning at her hairline, and continuing throughout her entire scalp, down her neck to her back. Dr. Kopari estimated that D. S. suffered burns to approximately fifteen (15%) percent of her body. Over the course of several months, D.S. endured at least seven surgeries for the treatment of her injuries.

---

[1] In accordance with La. R.S. 46:1844(W)(1)(a), we will refer to Defendant's victim by her initials to protect **her** identity.

2

At trial, Camille DeTrinis, a Nurse Practitioner at Children's, and one of the first medical professionals to evaluate D.S., testified that she saw D.S. in the PICU in order to obtain a medical incident history, and to formulate a medical diagnosis. Initially, she was unable to speak with D.S. as she noted the child was in a lot of pain, and heavily bandaged. Her face was extremely swollen, and one of her eyes was swollen shut, making her unable to see anything. Unable to speak with D.S., Ms. DeTrinis administered a skin test and photographed her injuries. She later spoke with D.S. in November 2021 after she was moved from the PICU to a regular floor.

Although D.S. was awake and playful at this second meeting, she was reticent to speak about her injuries. Ms. DeTrinis was unable to obtain a full history from the child. Ms. DeTrinis testified that the information D.S. provided was confusing and unclear. D.S. mentioned hot water, a bath tub and water pouring from above. She would not make eye contact with Ms. DeTrinis. Further, she was unable to speak with D.S.'s family members, or caretakers, including her mother or Defendant regarding the incident. Her medical evaluation determined that three to four percent of D.S.'s body was burned. While Ms. DeTrinis was concerned with the severity of the burns, her assessment of D.S.'s injuries was inconclusive as to abuse. She could not state with medical certainty that D.S.'s burns had not occurred accidentally.

The State's next witness, Detective Jesse Roger of the New Orleans Police Department's Child Abuse Unit, visited D.S., on October 8, 2021, but was unable to interview her because she was sedated. Detective Rogers interviewed the doctors involved with D.S.'s care, and learned that she had experienced a full thickness burn, or third-degree burn, to her head, back and neck. He further

discovered that upon arrival to the hospital, D.S. was in renal and kidney failure and exhibited symptoms of rhabdomyolysis- muscle tissue breakdown as a result of the kidney failure.

During the course of his investigation, Detective Roger also interviewed Andrielle Jones, D.S.'s mother. Ms. Jones reported that D.S. was injured accidentally. Ms. Jones explained that as she prepared to "dip the braids" of her friend's hair [2] a pot of water - "not a lot"- was boiling on the stove. She reported that her daughters, D.S. and D.J. were playing with each other and running through the house. Ms. Jones testified that one of the girls, bumped into the stove in the kitchen, which toppled the boiling pot onto D.S., causing her injuries.

Detective Roger interviewed Mikel Spencer[3], a friend of Ms. Jones and Defendant.  He testified that Ms. Spencer recalled that she visited Ms. Jones on or about October 6, 2021, and upon entering the home she immediately noticed D.S.'s injuries describing her as weak and listless. Ms. Spencer also disclosed to Detective Roger that during that visit she viewed a video of Defendant pouring water on D.S.'s head while the child was standing naked in the bathtub. Ms. Spencer reported that Defendant explained that he poured the water on D.S. because "she was acting like she was catching a seizure."

Detective Roger authorized a search warrant for Defendant's cell phone records in order to corroborate his whereabouts on October 5, 2021. Once he obtained the records, he and his sergeant presented them to the NOPD Analytics Unit who compiled the information and prepared a report. The NOPD Crime

---

[2] Ms. Jones asserts that she was putting braids in a friend's hair, and in order to seal the hair, the braids are dipped in hot water.
[3] Ms. Spencer did not testify at trial.

Analysis Report determined that Defendant's cell phone had been used, and was pinging at or near 4422 Touro Street, the address where D.S. sustained her injuries, on that date. Based on the cell phone records, his interview with medical professionals involved in D.S.'s care, and information adduced from his fellow investigating officers, Detective Roger authorized arrest warrants for Defendant and Andrielle Jones.

Dr. Anne Troy, a forensic nurse practitioner at the Audrey Hepburn Care Center, interviewed D.S. in April 2022. D.S. reported that "T"[4] poured hot water on her head in the bathroom, and it felt like lava. She also stated that "T" punched her where her heart beats, threatened her with a knife, and told her to stop crying. D.S. also reported that her mother was home when she was burned and did nothing.

Dr. Troy also obtained a medical incident history from D.J., D.S.'s younger sister. In November 2021, D.J. provided a history of witnessing the abuse to her sister. She disclosed that "T" poured hot water on D.S. while her sister cried and cried. Dr. Troy spoke with D.J. again in May 2023, and she testified that D.J.'s subsequent statement confirmed that she was a witness to her sister's abuse. Dr. Troy also testified that the histories provided to her by both children, who were aged four and three at this time, were "clear, detailed, spontaneous, and sensory driven."[5]

---

[4] "T" was a nickname D.S. used to refer to Defendant.
[5] Kate Homan, an expert in child forensic interviewing, testified she conducted a forensic interview with D.S. in March 2022, in which the child disclosed to her that "T" poured water on the top of her head.

On cross-examination, Dr. Troy explained that during these assessments, she and her colleagues are conscious of bias, and they are careful to maintain a differential of coaching while children are relating the details of abuse. She was impressed by both D.S. and D.J. and their communication skills. She determined that no red flags for coaching existed during her visits with these children. She observed that D.S. and D.J were exposed to "a lot of adverse childhood experiences." After speaking with the families of Defendant and Ms. Jones, Dr. Troy discovered the children had been subject to "family dysfunction and neglect and abuse that is multigenerational."

Arnesha Ambrose, a Detective with the NOPD Special Victims Division, Child Abuse Unit, testified that she interviewed Defendant in late November 2021. In a recorded statement, Defendant denied being at home at the time D. S. sustained her injuries. Instead, he stated that he did not arrive home until 11:30 p.m. that evening. Defendant reported that he checked on D.S. about 3:00 a.m. the morning after she was burned, and stated she looked fine. Defendant also acknowledged that neither he nor Andrielle Jones immediately sought medical treatment for D.S. because she seemed okay after she was injured.

Detective Ambrose had the opportunity to review Defendant's phone during the interview. She recalled viewing a picture of D.S. sitting on the stairs of her home with a full head of hair and severe facial swelling. She forwarded all of the information gathered during her interview with Defendant, to Detective Roger. She had no further involvement in the investigation.

The victim, D.S., also testified at trial with the support of a child victim advocate, and her Care Bear, "Cotton Candy." She stated that "T" put hot water on her because he wanted to be evil. She also referred to "T" as Dad in her testimony.

6

D.S. later testified that "T" was not her father, but she sometimes called him Dad. She also acknowledged calling him "T", and denied ever reporting that her mother burned her.

Dr. Nicole Kopari, the pediatric burn medical director at Children's was accepted as an expert in pediatric burn trauma, and critical care. Dr. Kopari initially reviewed D.S.'s medical chart at UMC. After consulting with a colleague, reviewing D.S.'s labs, photographs and observing the child, she decided to have D.S. transported to Children's.

During her first visit with D.S. at Children's, Dr. Kopari noticed that D.S. had second-degree burns to the back of her neck. Her skin had blistered and begun to peel. Dr. Kopari observed that her eyes were very swollen, and she had injuries to the scalp, head, and burns to the face. Dr. Kopari testified that when burned children first present to the emergency department for treatment they do not typically have facial swelling, as D.S. had. Instead, she frequently informs parents that swelling occurs in the days following sustaining the burn. Dr. Kopari noted during this first visit at Children's, that D.S. was lethargic and unresponsive.

Dr. Kopari testified that D.S.'s blood work revealed that her liver and kidneys were failing. These results indicated to Dr. Kopari that D.S. was severely ill, and the burns on her body had been present for some time. On the day after her admission to Children's, Dr. Kopari shaved D.S.'s hair where she discovered a third-degree burn to D.S.'s scalp. In order to sustain a burn of this type, Dr. Kopari opined that D.S. was exposed to a hot liquid with a temperature of 120 degrees for at least thirty seconds.

The type of burn sustained by D.S. would have resulted in immediate blistering, and skin peeling. According to Dr. Kopari, twelve to twenty-four hours

7

after sustaining a partial thickness burn, it should become apparent that this type of injury would not heal without medical intervention.

Dr. Kopari also discussed the pattern of D.S.'s burn and she opined that the initial contact with the water was with her head and neck, and then the water ran down her back. She testified that the burn was not a splash burn, in that there was a linear demarcation of the burn on her forehead. Instead, the pattern of the injury suggested that water was poured from her forehead, down her neck and back. In order for this to have been a splash burn, D.S. would have to be exposed to 160-degree water to have the depth of the burn that she sustained. The pattern of her burns were consistent with "dunking." Dr. Kopari explained that "dunking" is not a one-time event, but a long-term exposure to the hot water. She concluded that to sustains such injuries, D.S. was either held under running water, or had water consistently poured on her head.

On cross-examination, Dr. Kopari acknowledged that the hospital had documented two inconsistent stories regarding how D.S. was burned. The initial story from Ms. Jones was D.S. was burned while she was braiding her hair and dipping her braids. However, when the child reached the hospital, she had no braids in her hair. The second story was that the burn resulted from the boiling water on the stove splashing on D.S. Dr. Kopari explained that "dunking" was consistent with  the mechanism of her injury, and restated that her injuries were inconsistent with a splash burn.

Dr. Kopari testified that during D.S.'s hospital stay, she was constantly sedated, on high doses of pain medications due to her injuries, was given nutrition though a feeding tube, and had daily wound cleanings, or debridement, at her bedside. She endured multiple surgeries and experienced nightmares and

8

hallucinations. D.S. was also traumatized by the sight of water. In fact, her care team had to re-teach her that taking a bath was safe. Dr. Kopari also testified that D.S. will never regrow hair on her head due to the severity of the burns, and will need to have several cosmetic procedures for the rest of her life. D.S. would never again look as she had prior to her injuries.

Zina Wyble, Defendant's mother testified that she received a phone call from Defendant on October 7, 2021. She testified that Defendant was worried that a burn D.S. sustained was not resolving with treatment at home. He sent his mother a picture of D.S. Once she saw the swelling to the child's face, Ms. Wyble told Defendant that D.S needed to go to the doctor. She never spoke with Ms. Jones, but testified that she heard Ms. Jones in the background saying that she would "go right now." Ms. Wyble testified she did not have any other information regarding how D.S. was burned, but asserted her son's innocence.

Ms. Jones testified that Defendant was not responsible for burning D.S. She had no recollection of a video of Defendant pouring water on D.S., and denied that he was home at the time of the incident. Moreover, she testified that she was braiding her daughter's hair, preparing to dip her braids when D.S. was injured. She moved the pot of boiling water to the counter, bumped it, and the pot fell on D.S. However, she acknowledged that she told the hospital personnel that the pot fell off the stove because she was afraid of her family, specifically her mother, grandmother and cousin. [6]

---

[6] There was a considerable amount of tension between Ms. Jones and her family because they had previously reported her to the Department of Children and Family Services (DCFS). She testified that she made the story up about the pot falling off the stove because she panicked. Because of the tension with her family, she did not believe that she could depend on them for assistance or advice. The only support system she had at the time of D.S.'s injuries was Defendant.

On cross-examination, Ms. Jones explained that D.S. did not have braids in her hair upon arrival to the hospital because she removed her braids to treat her wounds with triple antibiotic ointment. She denied knowing the exact date D.S. was burned, and explained that she took D.S. to the hospital on the following day, October 7, 2021. However, Ms. Jones acknowledged signing an affidavit[7] stating D.S. was injured on October 5, 2021.

Ms. Jones strenuously denied any delay in D.S. receiving treatment for her wounds. She insisted that she did not comprehend the severity of the burns, and only one day, not two, elapsed between the incident and bringing D.S to the hospital. Ms. Jones was adamant that D.S. was not intentionally burned. She also denied keeping D.S. home from school to avoid being seen by the principal and her teachers. Ms. Jones disputed that D.S. had severe facial swelling before going to the hospital. She admitted, however, that Mickel Spencer visited the home on the same day D.S. was burned, and she did Ms. Spencer's hair after D.S.'s injuries occurred. Ms. Jones stated that neither Mickel Spencer nor Zina Wyble instructed her to take D.S. to the hospital. She did so on her own.

She testified as follows:

> Once I realized how extensive it was and was advised, I brought her to the doctor. That was not something that someone had to tell me. When I saw her head and seen it, then I brought her. But once I saw that she actually was burned and I realized it and it was the pieces right here, yes, it was then treated. And she was taken care of at home and then brought to the doctor.

_____

[7] The affidavit referred to in Ms. Jones cross-examination and redirect testimony was prepared and notarized by Defendant's attorney, Eusi Phillips. Ms. Jones testified that Mr. Phillips prepared the affidavit based on information she conveyed to him, but that she did not discuss the contents with her attorney.

Ms. Jones avowed that she and Defendant were good parents, and did their best to care for their children. She vehemently defended the time she spent in the hospital with D.S. although Dr. Kopari and Ms. DeTrinis did not recall seeing her at the child's beside. She testified that Defendant visited the hospital on at least one occasion.

## Errors Patent

In accordance with La.Cr.P. art. 920, all appeals are reviewed for errors patent. After a review of the record, we have detected none.

## Discussion

Defendant alleges seven assignments of error: (1) there is insufficient evidence to support his conviction; (2) the trial court erred when it failed to grant two challenges for cause during *voir dire*; (3) the trial court erred in admitting D. J.'s prerecorded statement; (4) Defendant's confrontation rights were violated when the Court permitted the State to elicit hearsay from Detective Roger about his conversation with Mickel Spencer; (5) the trial court erred when it permitted the State to elicit unqualified expert testimony from Detective Roger; (6) the trial court erred when it denied Defendant's motion for new trial based on the District Attorney's improper remarks during closing arguments, and (7) the trial court erred when it imposed the maximum sentence of 40 years.

### Assignment of Error Number One: the sufficiency of the evidence to support Defendant's conviction

Defendant contends the State failed to produce sufficient evidence to sustain his conviction for second-degree cruelty to a juvenile. He alleges the State's

evidence was circumstantial, and fails to consider that Andrielle Jones accidentally burned D.S. When a defendant raises issues on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the appellate court must first determine the sufficiency of the evidence. *State v. Hearold*, 603 So.2d 731, 734 (La. 1992). "The standard for reviewing a claim of insufficient evidence is whether after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Green*, 588 So.2d 757, 758 (La. App. 4th Cir. 1991); *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

The appellate court must review the record as whole. Further, if rational minds could disagree as to the interpretation of the evidence, then the conviction should be upheld. *State v. Vance*, 03-1946, p. 5 (La. App. 4 Cir. 6/30/040, 879 So.2d 862, 866 (citing *State v. Mussall*, 523 So.2d 1305 (La. 1988)). Additionally, when the State uses circumstantial evidence to prove elements of the offense, those elements must be proven in order to exclude every reasonable hypothesis of innocence pursuant to La. R.S. 15:438.[8] *State v. Williams*, 11-041, p.16 (La. App. 4 Cir. 2/29/12), 85 So.3d 759, 770 (citing *State v. Neal*, 00-0674, p. 9 (La. 6/29/21), 796 So.2d 649,657)).

Defendant was charged with second-degree cruelty of D.S., a violation of La. R.S. 14:93.2.3. Pursuant to La. R. S. 14:93.2.3(1):

> Second degree cruelty to juveniles is the intentional or criminally negligent mistreatment or neglect by anyone over the age of seventeen to any child under the age of seventeen which causes serious bodily injury or neurological impairment to that child.

---

[8] La. R.S. 15:438 provides: "The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence."

Defendant denied being at home when D.S. sustained her injuries. Instead, he argues, that it was his intervening act−taking D.S. to the hospital after showing his mother a picture of her injuries−that saved D.S.'s life.

The evidence at trial demonstrates that D.S. disclosed in a medical incident history that Defendant was responsible for her injuries. D.J., the victim's younger sister, reported to Dr. Troy that she witnessed the abuse to her sister, and that Defendant was the perpetrator. Dr. Troy surmised that both children's statements were consistent, and found no evidence of coaching in her medical incident histories with them.[9] Kate Homan conducted a forensic interview with D.S. in which the child also confirmed that Defendant burned her. Moreover, D.S. testified at trial, and identified Defendant as the person who burned her.

Ms. Jones was the only witness at trial to corroborate Defendant's statement to Detective Ambrose that he was not at home at the time D.S. was injured. However, Ms. Jones's testimony regarding how D.S. was injured is wholly inconsistent. At trial, she testified that she was braiding D.S.'s hair and was going to dip her braids in hot water. She moved the pot of water from the stove to the counter. While she was standing behind her daughter, she inadvertently bumped the pot, and the pot fell on D.S.

She also testified that she told the medical professionals at the hospital caring for D.S. a different story that the pot fell off the stove while her children were playing. Ms. Jones alleged that she created that story because she was afraid that her family would contact DCFS, which they had done several times

---

[9] Dr. Troy also noted in her testimony that D.S. and D.J's statements were made to her while in the temporary custody of Defendant's mother, Zina Wyble.

previously. Additionally, on cross-examination, Ms. Jones also confirmed that in December 2021, she was untruthful in a previously executed affidavit, in which she attested that D.S. bumped the pot off the stove onto her head while playing in the kitchen with her sister.

Defendant also argues that his innocence is evident from the record because it is reasonable to believe that D.S. was accidentally burned while her mother was braiding her hair. Dr. Kopari, however, contradicts any theory that D.S.'s injuries resulted from an accidental "splash burn." Instead, Dr. Kopari affirmed that the injuries D.S. sustained were consistent with a long-term exposure to hot water, or "dunking." On direct examination, she stated:

> So she was either held under running water, she had consistent water poured on her, she was kinda held in this area, as opposed to just like a single event, one-time splash on her.

Moreover, after obtaining the medical incident histories of D.S. and D.J., Dr. Troy also concluded that D.S. sustained her injuries as a result of physical abuse and medical neglect.

Defendant also argues that the evidence is insufficient to support his conviction because D.S. allegedly told hospital staff that her mother was the perpetrator and that Ms. Jones "dunked" D.S.'s head in hot water. He asserts that D.S.'s statement confirms that her mother was braiding her hair when D.S. sustained her injuries. Detective Jesse Roger testified on cross-examination that he was aware of the statement, but he could never confirm to whom the child made the statement. Dr. Troy did not have any knowledge regarding D.S.'s statement about her mother, but testified that at the time D.S. allegedly made the statement about her mother, she was likely heavily medicated, and endured several painful procedures including laser treatments taken from her back for skin grafts. She also

14

stated that the pattern of D.S.'s injuries, which included a full thickness burn down her spine, was inconsistent with her head being dunked in hot water while getting her hair done. "Because dunking a head in water and pulling it out doesn't give you the injuries that we saw."

Defendant also relies on Dr. Kopari's testimony that D.S. injuries could have resulted from "dunking", and D.S.'s statement to support his contention that D.S. was accidentally burned by her mother. Dr. Kopari also testified, however, that D.S.'s injuries were consistent with a cup of water being dumped on her head in a bathtub. She also opined that her injuries could have resulted from water from the bathtub or faucet, if dumped repeatedly on her head. As explained above, Dr. Kopari denied that the act of "dunking" was a one-time event, but instead it was a long-term exposure to hot water. Thus, Dr. Kopari's testimony directly contradicts Ms. Jones' testimony that bumping the pot of hot water onto D.S. caused her injuries.

Defendant asserts in his brief to the Court that the only evidence supporting his conviction was D.S.'s testimony, D.J.'s recorded statement and Detective Roger's statement from Mickel Spencer that she viewed a video of Defendant pouring water on D.S. Appellate courts, as reviewing courts, are highly deferential to the findings of a jury. *State v. Castro*, 16-0284, p. 8 (La. App. 4 Cir. 12/14/16), 206 So.3d 1059, 1064 (citing *State v. Hamdan*, 13-0113, p. 10 (La. App. 4 Cir. 12/11/13), 131 So.3d 197, 204)). Thus, the jury may accept as true the testimony of a single witness, and find that testimony sufficient to establish each element of the offense beyond a reasonable doubt. *Hamdan*, 131 So. 3d at 204. Notwithstanding. D.J's recorded statement, or Mickel Spencer's statement regarding the video, the testimony of D.S. alone is sufficient to support Defendant's conviction.

15

The jury was presented with the testimony of the victim, medical testimony from experts, Detective Roger's testimony, as well as the testimony of Andrielle Jones. This testimony revealed that a four-year old child suffered second and third degree burns over fifteen percent of her body, is permanently disfigured, and will never regrow her hair. The medical evidence also demonstrated that there was a two to three-day delay before treatment was sought for D.S. Dr. Kopari testified that anyone caring for this child, should have sought immediate medical treatment. "I would say anybody with no medical experience or any medical experience at all would have brought this child in immediately." Based on this testimony, the jury found that Defendant either intentionally burned her, or he was criminally negligent in his mistreatment of her, in delaying her medical care for such injuries. Viewing the evidence in the light most favorable to the prosecution, we find there was sufficient evidence to convict Defendant of second-degree cruelty to a juvenile. This assignment of error has no merit.

**Assignment of error number two: the trial court erred when it failed to grant the defendant's cause challenges**

Defendant asserts that during the *voir dire* process, Jurors no. 30 and 36 displayed an inability to remain impartial.[10] Pursuant to La. Const. art. 1, § 17(A), "[t]he accused shall have a right to a full *voir dire* examination of prospective jurors and to challenge jurors peremptorily." "In trials of offenses punishable by death or necessarily by imprisonment at hard labor, each defendant shall have twelve peremptory challenges, and the state twelve for each defendant." La.

_____

[10] Defendant filed an emergency writ application with this Court seeking review of the trial court's ruling on his cause challenges, case no. 2023-K-0274. On April 25, 2023, this Court stayed the proceedings in the trial court until 9:00 a.m. on April 26, 2023. This Court denied Defendant's writ, finding, that Defendant had an adequate remedy on appeal.

C.Cr.P. art. 799. A reversal of the defendant's conviction and sentence are required when all twelve peremptory challenges are used by the defendant, and a trial court's erroneous ruling on a challenge for cause deprives the defendant of a peremptory challenge, it constitutes a substantial violation of the defendant's constitutional and statutory rights. *State v. Bienemy*, 23-0271, p. 4 (La. App. 4 Cir. 12/4/23), 382 So.3d 1011, 1015 (citing *State v. Juniors*, 03-2425, pp.7-8 (La. 6/29/05, 915 So.2d 291, 304)). When the defendant has exhausted his peremptory challenges, he must then demonstrate that the trial court erroneously denied his valid cause challenges. *Id.* "The district court is granted broad discretion in ruling on challenges for cause and their ruling will only be reversed if the *voir dire* record as whole shows an abuse of discretion." *State v. Bienemy*, 382 So.3d at 1015.

According to the record, Defendant used all of his peremptory challenges.[11] Pursuant to La.C.Cr.P.art. 799(2), a defendant may challenge a juror for cause if "[t]he juror is not impartial, whatever the cause of his partiality.[12] The challenges for cause at issue on appeal concern Jurors no. 30 and 36. During *voir dire*, the State was questioning the panel, and queried whether due to personal reasons they

---

[11] Although defense counsel argued to the trial court using his peremptory challenges on Juror 30 and 36 would prevent him from striking other jurors, he did not identify other Jurors he intended to strike.

[12] Pursuant to La. C.Cr.P. art. 799, the state or the defendant may challenge a juror for cause on the ground that:

(1) The juror lacks a qualification required by law;

(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;

(3) The relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict;

(4) The juror will not accept the law as given to him by the court; or

(5) The juror served on the grand jury that found the indictment, or on a petit jury that once tried the defendant for the same or any other offense.

would not be a good fit for the jury. Juror no. 30 answered that because of a prior incident of abuse with a former student, she did not believe she could be unbiased. The State subsequently asked if she would be able to find Defendant not guilty, to which she replied, "Correct."

The State asked if other panelists had similar experiences. Juror no. 36 responded as follows: "Yes, I have had certain experience with child abuse and neglect, so I don't think I'm particularly good for this case…" Counsel for the defense later addressed these jurors asking them to confirm that based on their personal experiences, this was probably not the best case for them to consider. Both jurors answered affirmatively.

The final exchange between defense counsel and the two jurors came after he addressed the collective panel regarding reasonable doubt. At the end of his discussion of reasonable doubt, counsel asked: "And, of course, what naturally follows is if the State does not carry their burden, and does not prove their case beyond a reasonable doubt, what's your verdict? Collectively, what's your verdict?" All prospective jurors collectively replied, "Not Guilty."

When reviewing a trial court's decision to deny challenges for cause, "the appellate court should accord great deference to the district court's ruling on a challenge for cause, which is necessarily based, in part, on the court's personal observations during questioning." *State v. Mickelson*, 12-2539, pp. 12-13 (La. 9/3/14), 149 So.3d 178, 186-187. The trial court is afforded vast discretion in ruling on challenges for cause, and the ruling will only be disturbed if the *voir dire* as a whole reveals an abuse of discretion by the trial judge. *Id.* at 187.

The law does not demand that a jury be composed of panelists who have not been victims of crime, or who have not had a relationship with a crime victim. It

18

does, however, require jurors to be fair and impartial. *Juniors*, 03-2425, p. 11, 915 So.2d at 306. A juror's past experience or relationship to a crime victim similar to what the defendant is being tried should be examined along with other evidence in the *voir dire* proceeding that bears on the juror's ability to be fair and unbiased, and to apply the law as instructed by the court. *See State v. Dorsey*, 10-0216, pp.38-39, (La. 9/7/11), 74 So.3d 603, 631. Jurors no. 30 and 36 did acknowledge that if the State was unable to carry their burden of proof in this case the verdict should be not guilty during the jury's collective answer.

Further, during the pendency of Defendant's emergency writ on this issue, the trial judge issued a per curiam explaining his reasoning in denying Defendant's challenges for cause during *voir dire*. The trial judge also specifically addressed a juror's past relationship with child abuse:

> This court posits that a juror's experience whether secondhand or firsthand, with child abuse, a topic which by its very nature is emotionally charged, should not, in and of itself, preclude a juror from serving on a case which has child abuse as one of its elements.

Based on our review of the record, including the *voir dire* proceedings in its entirety, we find that the trial court did not abuse its discretion when denying Defendant's cause challenges for Jurors 30 and 36.

## Assignment of error number three: the trial court erred in admitting D.J.'s prerecorded statement

Defendant argues that the admission of D.J.'s prerecorded statement, in which she stated Defendant poured hot water on D.S., constituted impermissible hearsay. The State, however, contends that D.J.'s statement was admissible under La. C.E. art. 803(4).

La. C.E. art. 801(C) provides the definition of hearsay. "'Hearsay' is a statement, other than one made by the declarant while testifying at the present trial

19

or hearing, offered in evidence to prove the truth of the matter asserted. Hearsay is not admissible unless otherwise provided by the Louisiana Code of Evidence or other legislation. La. C.E. art. 802. Statements for purposes of medical treatment and medical diagnosis in connection with treatment, pursuant to La. C. E. art. 803(4) are not excluded by the hearsay rule:

> Statements made for purposes of medical treatment and medical diagnosis in connection with treatment and describing medical history, or past and present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to treatment or diagnosis in connection with treatment.

The Louisiana Supreme Court has found statements made by a victim during treatment in an emergency room in which she identified her boyfriend as the perpetrator admissible, under La C.E. art. 803(4). *State v. Koederitz*, 14-1526, p. 4 (La. 3/17/150), 166 So.3d 981, 984. "[B]ecause they were made for the non-testimonial purposes of, and were reasonably pertinent to medical treatment, and diagnosis in connection with medical treatment, in a case that appeared to be one of domestic violence…" Id. at 984. D.J.'s statement regarding Defendant pouring hot water on her sister was made during a medical incident history with Dr. Troy, as part of a medical examination to determine if D.J. was abused or neglected by her mother. Dr. Troy did not conduct a forensic interview of D.J., but an incident history for the purpose of rendering a medical diagnosis and treatment. In accordance with *Koederitz*, we find D.J.'s statement admissible pursuant to La. C.E. art. 803(4).

Notwithstanding this, if D.J.'s statement was improperly admitted, the erroneous admission of hearsay is subject to a harmless error analysis. *State v. Willie*, 559 So.2d 1321,1332. "'Harmless error analysis begins with the premise

20

that the evidence is otherwise sufficient to sustain the conviction if viewed from the perspective of a rational fact finder and asks whether beyond a reasonable doubt the error could not have contributed to the verdict actually returned by the defendant's jury.'" *State v. Campbell*, 15-0017, p.27 (La. App. 4 Cir. 6/24/15), 171 So.3d 1176, 1192 (quoting *State v. Gibbs*, 41-062, p. 8 (La. App. 2 Cir. 6/28/06), 935 So.2d 349, 354). Harmless error exists when the guilty verdict rendered was "surely unattributable" to the error. *State v. Higginbotham*, 11-0564, p. 3 (La. 5/6/11), 60 So. 3d 621, 623.

The record is replete with evidence other than D.J.'s statement to Dr. Troy regarding Defendant's guilt on the charge of second-degree cruelty to a juvenile: D.S.'s trial testimony, D.S.'s corroborating statement to Dr. Troy that Defendant intentionally burned her, D.S.'s statement to Kate Homan that Defendant was the perpetrator, and Dr. Kopari's testimony regarding the severity of her injuries. Further, the delay in seeking treatment for D.S. which resulted in organ failure also refutes Defendant's argument that his guilty verdict was attributable solely to D.J.'s statement. The assignment of error lacks merit.

## Assignment of error number four: the trial court erred when it permitted the State to elicit hearsay from Detective Rogers regarding his conversation with Mickel Spencer

The Sixth Amendment to the U.S. Constitution guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him...." The main and essential purpose of confrontation is to secure the opportunity of cross examination. *Davis v. Alaska,* 415 U.S. 308, 315–16, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974). The La. Const. Art. 1, §16 states, in pertinent part, that "[a]n accused is entitled to confront and cross-examine the witnesses against him." The trial court permitted the State to question Detective Roger

21

regarding his telephone conversation with Ms. Spencer, over the objection of Defendant. The State alleges that Defendant may not now raise this confrontation argument on appeal as counsel for defense only objected to the testimony of Ms. Spencer on hearsay grounds, not on confrontation clause grounds.

This court has declined to consider a confrontation clause argument on appeal when the defendant only objected to the evidence on the ground of hearsay. *State v. Hatfield*, 13-0813, p. 49 (La. App. 4 Cir. 7/2/14), 155 So. 3d 572, 602-603. In *Hatfield*, the defendant argued that the admission of hearsay evidence by the detective investigating his case, violated his confrontation rights. *Id.* The trial court record revealed that defendant only objected to the introduction of the evidence on hearsay grounds. This court stated: "A defendant must make a contemporaneous objection 'to a claimed violation' in order to prepare it for appellate review." *Hatfield*, pp. 49-50, 155 So.3d at 603 (quoting *State v. Vallo*, 13-1369, p. 4 (La. 1/10/14), 131 So.3d 835, 837.) La.C.Cr.P. art. 841(A) provides, in pertinent part, "[a]n irregularity or error cannot be availed of after verdict unless it was objected to at the time of the occurrence." The defendant must make known the grounds for an objection, and he is limited on appeal to those grounds articulated at trial. *State v. Ott*, 10-1307, p. 13 (La. App. 4 Cir. 1/5/12), 80 So. 3d 1280, 1287.

Ms. Spencer did not testify at trial, and the video which allegedly shows Defendant harming D.S. was not admitted at trial.[13] Defense counsel objected to Detective Roger's testimony regarding Ms. Spencer, and the following colloquy occurred:

---

[13] Detective Rogers never saw the video. Ms. Spencer told him about the video in the telephone interview. The video was never produced at trial.

*Q.* How did she describe the victim -- describe [D.S.] as doing? How did she describe [D.S.] as looking? Please tell the jury everything she said in that regard.

**MR. PHILLIPS:**

Objection. Calls for hearsay.

**THE COURT:**

What's the objection?

**MR. PHILLIPS:**

Hearsay.

The State argued, in response to the objection, that the out of court statement was not used to prove the truth of the matter asserted. Instead, it was used as a present sense impression, and an exception to the hearsay rule.[14] The State also asserted that Ms. Spencer would be available to testify. The trial court overruled the objection. Though Defendant objected on hearsay grounds, he made no contemporaneous objection to the denial of his right to confrontation as to Mis. Spencer's alleged hearsay statement; thus, he is barred from raising that issue on appeal. See *State v. Hatfield,* 155 So. 3d at 603.[15] There is no merit to this assignment of error.

**Assignment of error number five: the trial court erred when it permitted the State to elicit inadmissible hearsay testimony from Detective Rogers pertaining to Defendant's alleged location**

Defendant argues that Detective Roger should not have been permitted to testify regarding cell tower location technology because he was not qualified as an

---

[14] La. C. E. art. 803(1), provides; "A statement describing or explaining an even or condition made while the declarant was perceiving the event or condition, or immediately thereafter.

[15] Confrontation clause violations like the admission of hearsay are subject to a harmless error analysis. As discussed previously, the verdict in this case seems surely un-attributable to the hearsay reflecting Ms. Spencer's comments to Detective Roger.

expert in that field, and had not himself analyzed the raw data to determine the location of Defendant's cell phone. The State argues that it is unnecessary for Detective Roger to be qualified as an expert to present the jury with information concerning Defendant's cell phone records obtained through the course of his investigation.

At trial Detective Roger testified that he obtained a search warrant for Defendant's cell phone records through T-Mobile, and once he obtained the records, they were presented to the NOPD Analytics Unit. The NOPD Crime Analysis Report determined that Defendant's cell phone had been used, and was pinging at or near 4422 Touro Street, the home of D.S., on the day that she was injured. The report was admitted into evidence. On cross-examination, Detective Roger acknowledged that he was not familiar with the technology used in determining cell phone locations. Similarly, in *State v. Jackson*, 15-0809, p. 22 (La. App. 4 Cir. 5/25/16), 193 So.3d 425, 438, the detective testified regarding the information supplied by cell phone providers of the defendants that he used during the course of his investigation. He too admitted that he was no expert in cell phone towers and ranges. *Id.* The court allowed Detective Hamilton to explain which cell towers accepted the cell phone signals from the defendants' phones based on his examination of the cell phone records. *Id.* The Court found no abuse of discretion in permitting the detective to testify as to the calls made and received, as well as the tower locations. *Id.*

The *Jackson* court relied on a prior First Circuit ruling, which held that a police officer is not required to have expert knowledge regarding the interpretation and explanation of cell phone records. *State v. Morgan*, 12-2060, p. 14 (La. App. 1 Cir. 6/17/13), 119 So.3d 817, 827. "A lay witness can infer and tell the jury what

24

cell tower accepted the mobile signals at specific times based on that witness's examination of cell phone records." *State v. Morgan*, 119 So.3d at 827. Here Detective Roger acquired Defendant's cell phone records, and testified regarding their contents pursuant to report prepared by the NOPD Analytics Unit. In accordance with the jurisprudence, Detective Roger was not required to have expert knowledge regarding cell phones. The trial court did not abuse its discretion in allowing the detective's testimony regarding Defendant's cell phone records. This assignment of error also lacks merit.

**Assignment of error number six: the trial court erred when it Denied Defendant's motion for new trial based on the District Attorney's improper remarks during closing argument**

Defendant argues that the district attorney's comments during his rebuttal argument constituted a personal attack that was so inflammatory that it prejudiced Defendant's right to be judged on the evidence, and contributed to the jury's verdict of second-degree cruelty to a juvenile. Defendant moved for a new trial based[16] in part on the remarks made by the district attorney during closing arguments. Pursuant to La. C.Cr.P. art. 851(A)[17], "[t]he motion for new trial is

---

[16] Defendant's motion for new trial is absent from the appellate record. The State's opposition to the motion for new trial, however is contained in the record. The Orleans Parish Clerk of Criminal Court in a letter dated September 24, 2024 informed this Court that a copy of Defendant's Motion for New Trial is not contained in their record. In the sentencing transcript, however, defense counsel stated three bases for the motion for new trial: the improper cause challenge denial, the personal attack launched against defense counsel during closing argument, and that the verdict is contrary to the law and evidence.

based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case, the motion shall be denied, no matter upon what allegations it is grounded." "The merits of such a motion must be viewed with extreme caution in the interest of preserving the finality of judgments." *State v. Martin,* 13-0115, p. 12 (La. App. 4 Cir. 12/4/13), 131 So.3d 121, 129 (quoting *State v. Celestine,* 00-2713, p. 8 (La. App. 4 Cir. 2/13/02), 811 So.2d 44, 49)). A district court's "ruling on a motion for new trial will not be disturbed on appeal absent a clear showing of an abuse of discretion." *State v. Gordon*, 13-0495, p. 21 (La. App. 4 Cir. 7/16/14), 146 So.3d 758, 771 (citing *State v. Cox,* 10-2072, p. 1 (La. 11/19/10), 48 So.3d 275).

During his rebuttal in closing arguments, the district attorney stated the following:

> Ladies and gentlemen of the jury, I don't need to tell you that everything Mr. Phillips said was a lie, because he told me that. About five minutes ago, he said, "Let me be honest with you." What that statement really means is, let me be honest with you now. Because some of the stuff that I might have been pushing, might not quite be it.

---

[17] La. C.Cr. P. art. 851(B) provides: The court, on motion of the defendant, shall grant a new trial whenever any of the following occur:

(1) The verdict is contrary to the law and the evidence.

(2) The court's ruling on a written motion, or an objection made during the proceedings, shows prejudicial error.

(3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty.

(4) The defendant has discovered, since the verdict or judgment of guilty, a prejudicial error or defect in the proceedings that, notwithstanding the exercise of resonable diligence by the defendant, was not discovered before the verdict or judgment.

(5) The court is of the opinion that the ends of justice would be served by the granting of a new trial, although the defendant may not be entitled to a new trial as a matter of strict legal right.

(6) The defendant is a victim of human trafficking or trafficking of children for sexual purposes and the acts for which the defendant was convicted were committed by the defendant as a direct result of being a victim of the trafficking activity.

> Let me make a confession myself. I have never in my years of practice felt emotional rage, physical rage, anger at an opposing side, at a defendant, at a lawyer.

Defense counsel immediately objected to the district attorney's argument, and the court sustained the objection. Defense counsel did not seek an admonition from the judge, nor did he request a mistrial at that time based on these comments.

The State argues defense counsel's failure to seek an admonishment for the district attorney's remarks precludes it from arguing prejudice on appeal citing *State v. Baylis*, 388 So.2d 713, 721, and *State v. Breaux*, 598 So.2d 719, 721 (La. App. 4 Cir. 1992).("Since the court acted properly in sustaining the defendant's objection, and the defendant thereafter failed to request an admonition or mistrial, the defendant cannot now claim that the remark was prejudicial"). We find that although, Defendant did not request an admonition from the trial court at the time of the State's remarks, he did raise the issue in his motion for new trial. This case, then, is distinguishable from *Bayliss* and *Breaux*, as neither of those defendants raised theirs claim in a motion for new trial.[18]

La. C.Cr.P. art. 774 provides:

> The argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case. The argument shall not appeal to prejudice. The state's rebuttal shall be confined to answering the argument of the defendant.

The scope of closing arguments is limited to the evidence admitted, lack of evidence, conclusions of fact that the state or defendant may draw from, and the law applicable to the case. *State v. Casey*, 99-0023, p. 17 (La. 1/26/00), 775 So.2d

---

[18] We also note for the record that Defense counsel, Eusi Phillips withdrew from representing Defendant prior to sentencing. Defendant's new counsel, Jane Hogan, was given leave by the trial court to file post-trial motions and raised the issue in a motion for new trial.

1022, 1036. The trial court has vast discretion in determining the scope of closing argument. *State v. Prestridge*, 399 So.2d 564, 580 (La. 1981). A prosecutor is barred from making personal attacks on defense counsel or his strategy. *State v Manning*, 03-1982, p. 75 (La. 10/19/04), 885 So.2d 1044, 1108 (citations omitted). However, Louisiana jurisprudence affords prosecutors wide latitude in choosing closing argument tactics. *State v. Allen*, 12-1757, p. 3 (La. App. 4 Cir. 10/9/13), 126 So. 23d 675, 678. *See also State v. Martin*, 539 So.2d 11235, 1240 (La. 1989).

> Even assuming that remarks were inappropriate, a conviction will not be reversed due to an improper remark during closing argument unless the court is thoroughly convinced that remark influenced the jury and contributed to the verdict. **Much credit should be accorded to the good sense and fair-mindedness of jurors who have seen the evidence and heard the arguments, and have been instructed by the trial judge that arguments of counsel are not evidence.**

*State v. Kyles*, 513 So.2d 265, 275-76 (La. 1987).

"Even assuming that remarks were inappropriate, a conviction will not be reversed due to an improper remark during closing argument unless the court is thoroughly convinced that the remark influenced the jury and contributed to the verdict." *State v. Smith*, 11-0091, p. 28 (La. App. 4 Cir. 7/11/12), 96 So.3d at 694-95.

After the district attorney made his remarks against defense counsel during rebuttal argument, the trial court sustained defense counsel's objection, and told the district attorney, "[t]his is no way personal." In a previous colloquy during defense's closing argument, the trial judge overruled an objection by the district attorney, and similarly refused to admonish defense counsel for remarks the district attorney deemed false. The trial court indicated the following to the district attorney: "[i]t's his argument." The trial court gave both the state and defense counsel latitude during their closing arguments.

Although we find the district attorney's comments during rebuttal were an improper personal attack on defense counsel, it does not result in reversible error. After a review of the record, especially considering the "common sense and fair-mindedness of the jury," and the abundance of evidence the jury considered in rendering its verdict, we find that the trial judge did not abuse his discretion in denying Defendant's motion for new trial. This assignment of error lacks merit.

**Assignment of error number seven: the trial court erred when it imposed the maximum sentence of 40 years**

In his final assignment of error, Defendant argues that the maximum sentence is unwarranted in this case given the lack of support for Defendant's conviction. The State argues that Defendant's sentence does not shock the conscience, and was not an abuse of the trial court's discretion. Excessive sentences are prohibited by La. Const. Art. 1 §20. This Court has posited that "[a]lthough a sentence is within the statutory limits; the sentence may still violate a defendant's constitutional right against excessive punishment." *State v. Lambert*, 15-0629, p. 22 (La. App. 4 Cir. 3/16/16), 191 So.3d 630, 644. Further, "[a] sentence is unconstitutionally excessive when it imposes punishment grossly out of proportion to the severity of the crime, makes no measurable contribution to acceptable goals of punishment, or constitutes nothing more than needless infliction of pain and suffering." *State v. Turner*, 2018-0326, p. 6 (La. App. 4 Cir. 11/28/18), 259 So.3d 1089, 1093-94.

When reviewing a claim for an excessive sentence, the court must first determine whether the trial court complied with the sentencing guidelines set forth in La. C.Cr.P. art. 894.1, and whether the sentence is supported by the facts in the record. *State v. Martin*, 13-6028, p. 17 (La. App. 4 Cir. 5/28/14), 141 So.3d 933,

944. If the trial court has complied with La. C.Cr.P. art. 894.1, the appellate court shall determine whether the sentence imposed is too severe considering the defendant and the circumstances of the case. *State v. Bell,* 09–0588, p. 4 (La. App. 4 Cir. 10/14/09), 23 So.3d 981, 984. The court must bear in mind that maximum sentences should be reserved for the most egregious offenders. *Id.* at 984.

When the trial court has not complied with La. C.Cr.P. art. 894.1, resentencing the defendant is unnecessary when the record demonstrates an adequate factual basis for the sentence imposed. *State v. Stukes,* 08–1217, p. 25 (La. App. 4 Cir. 9/9/09), 19 So.3d 1233, 1250 (citing *State v. Major,* 96–1214, p. 10 (La. App. 4 Cir. 3/4/98), 708 So.2d 813, 819). Moreover, La. C.Cr.P. art. 881.4(D) states that an "appellate court shall not set aside a sentence for excessiveness if the record supports the sentence imposed." The trial judge has vast discretion when imposing a sentence, and the appellate court may not set the sentence aside unless there has been a manifest abuse of discretion. *State v. Hackett*, 13-0178, p. 14 (La. App. 4 Cir. 8/21/13), 122 So.3d 1164, 1174.

The trial judge did not reference La. C.Cr.P. art. 894.1 when sentencing Defendant; however, the judge ordered a pre-sentence investigation report which reflects Defendant's prior convictions for illegal carrying of weapons, possession of cocaine, and felon in possession of a firearm. According to the transcript of the sentencing hearing, the trial court sentenced Defendant to the maximum sentence after hearing victim impact statements from the present caregiver and great-grandmother, of D.S., Artemis Jones, as well as her grandmother and other family members. Artemis Jones testified that D.S has been diagnosed with post-traumatic stress disorder, suffers from anxiety, and takes several medications in the morning and at night. She continues to live with pain, suffers from nightmares, and is afraid

to be alone. Her grandmother, Patrice Jones, testified about the trauma that D.S.[19] suffers from being separated from her siblings, and how D.S. will never be or look the same after her traumatic injuries. Prior to her injuries, she was a loving and caring child, now she lashes out, bullying children at her school.

Although Defendant argues that the evidence neither supports his conviction, nor his sentence, the trial court reviewed evidence of the pain and suffering sustained by D.S. that resulted in her permanent disfigurement. Dr. Troy described D.S.'s condition as a child with full thickness burns from the top of her head with no hair on her scalp, all the way down her neck with keloids. During the medical incident history with D.S. on April 23, 2022, Dr. Troy reported that she was bleeding from her neck, could not move her shoulders down, and had keloids on her spine. Dr. Kopari testified that at one-point D.S.'s burns resembled "raw hamburger meat." She stated that D.S.'s injuries will require multiple surgeries to release skin from her neck because of her propensity as an African American child to keloid. The keloid on her neck also limits her range of motion, and affects her daily physical activities. The trial court was also faced with Dr. Kopari's testimony that within twelve to twenty-four hours of sustaining her burns, D.S.'s skin began to blister and peel, and the delay in seeking treatment for her injuries resulted in multi-organ failure for the child with a fifty percent (50%) mortality rate.

Lastly, D.S. testified at trial and identified Defendant as the person responsible for her injuries. She also identified Defendant as the perpetrator in a forensic interview with Kate Homan, and in a medical incident history with Dr. Anne Troy while her sister D.J. corroborated that Defendant burned her sister in

---

[19] D.S. is now in the custody of Artemis Jones. A restraining order bars Ms. Jones from any contact with the child.

two separate incident histories with Dr. Troy. For these reasons, we find the trial court did not abuse its discretion in imposing the maximum sentence upon Defendant.

## **<u>DECREE</u>**

For the foregoing reasons, we affirm Defendant's conviction for second-degree cruelty to a juvenile pursuant to La. R.S. 14:93.2.3, and maximum sentence of forty years.

**AFFIRMED**